**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JOSEPH THERIAULT and WILLIAM WEIGEL, individually and on behalf of all those similarly situated, | Case No. |
| *Plaintiffs*, | |
| v. | CLASS ACTION COMPLAINT |
| NEW DIRECTION IRA, INC., NEW DIRECTION TRUST COMPANY, and MAINSTAR TRUST, | |
| *Defendants*. | |

## INTRODUCTION

This case involves precious-metals IRAs—that is, self-directed individual retirement accounts ("SDIRAs") invested in precious metals (e.g., silver bars or coins)—held and/or administered by the named defendants (collectively "Defendants"). When Plaintiffs opened their precious-metals SDIRAs with New Direction IRA, Inc. ("NDIRA"), it gave them a short list of depositories at which their SDIRA precious metals would be "safely locked away and insured." First State Depository, LLC ("FSD") was on that list.

After opening their SDIRAs, Plaintiffs received annual holdings reports from NDIRA (and after 2018, New Direction Trust Company) confirming the value of their precious metals that were supposedly safely locked away and insured at FSD. Not once did Defendants so much as suggest to Plaintiffs that there was even the slightest reason to be worried about FSD.

In 2022, the Commodity Futures Trading Commission ("CFTC") filed a lawsuit against FSD and its owner, Robert Higgins. In that lawsuit, the CFTC alleged that FSD and its co-defendants had stolen more than $110 million of the precious metals that were supposed to have been safely locked away and insured. 90% of the missing precious metals belonged to SDIRAs. **A disproportionate number of those SDIRAs—50%—were New Direction SDIRAs.**

Due to the CFTC's lawsuit, FSD was placed in receivership. The receiver created a website (fsdreceivership.com) that includes detailed reports of his investigation and efforts to recover the missing property. Despite those efforts, more than $78 million in precious metals and currency are still missing from FSD's vaults. Meanwhile, Higgins has been arrested and faces criminal charges.

Plaintiffs and hundreds of others precious-metals SDIRA accountholders who were directed to FSD by New Direction have suffered the loss of tens of millions in hard-earned retirement savings. Plaintiffs bring this case on behalf of themselves and all similarly situated New Direction SDIRA accountholders to recover the value of their missing precious metals and hold Defendants accountable.[1]

## THE PARTIES

1.     Plaintiff Joseph Gilbert Theriault is a resident of Williston, Vermont.

2.     Plaintiff William Weigel is a resident of Olathe, Kansas.

3.     New Direction IRA, Inc. ("NDIRA"), formerly Entrust of Colorado, is a Colorado company with its principal place of business in Colorado. NDIRA may be served with process through its Colorado registered agent: Resident Agents Inc., 1942 Broadway Ste. 314C, Boulder, Colorado 80302. NDIRA also goes by the registered trade name "Entrust New Direction IRA, Inc."

4.     New Direction Trust Company ("ND Trust") is a Kansas bank and trust company, with its principal place of business in Kansas, and may be served at its office located at 5901 College Blvd., Suite 100, Overland Park, Kansas 66211.

---

[1] There are at least two related cases in this District of which the Court should be aware. Plaintiff Theriault filed a similar suit on March 3, 2023, and was assigned case number 23-cv-02091. The case was voluntarily dismissed without prejudice while the receiver's work was still underway. On April 20, 2023, *Glahn v. West Hills Capital, LLC*, Case No. 23-cv-01064 was filed. That case involves the "Silver Lease Program" discussed in the CFTC's complaint and sold to investors through Wichita-based West Hills Capital, LLC. The class definition in this case excludes those who were only part of the Silver Lease Program.

5.      Mainstar Trust, formerly First Trust Company of Onaga, is a Kansas bank and trust company with its principal place of business in Kansas and may be served through its Kansas registered agent: Bradley E. Scafe, 5901 College Blvd. Ste. 100, Overland Park, Kansas 66211.

### JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because it is a class action case; the matter in controversy exceeds $5,000,000; and none of the defendants is a citizen of Vermont, where Plaintiff Theriault is a citizen.

7.      The Court has personal jurisdiction over ND Trust and Mainstar pursuant to Fed. R Civ. P. 4(k)(1)(A), because they are Kansas corporations, actively registered to do business in Kansas and are therefore subject to general jurisdiction in Kansas.

8.      The Court has personal jurisdiction over NDIRA pursuant to Fed. R Civ. P. 4(e) and the Kansas long-arm statute, Kan. Stat. Ann. § 60-308(b)(1), which provides that an out-of-state party has submitted to personal jurisdiction in Kansas courts if, among other things, the claims against that party arise from the party "[t]ransacting any business" in Kansas. NDIRA has submitted to personal jurisdiction in Kansas under the long-arm statute because Plaintiffs' claims against it arise from its business with ND Trust and Mainstar Trust, both of which are Kansas companies, its relationship and dealings with Plaintiff Weigel (a Kansas resident), and its years' long practice of conducting business closely with Mainstar Trust, causing NDIRA to have the requisite Kansas contacts.

9.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (c)(2).

## GENERAL ALLEGATIONS

### *Self-Directed Individual Retirement Accounts Generally*

10.     A self-directed individual retirement account ("SDIRA") is a type of individual retirement account ("IRA") that can hold various alternative investments normally prohibited from regular IRAs.

11.     Regular IRAs are generally limited to common securities like stocks, bonds, certificates of deposit, and mutual or exchange-traded funds.

12.     An SDIRA provides freedom and flexibility for individuals to save for retirement using alternative investment options, such as real estate, precious metals, and rare coins and collectibles (e.g., a baseball card collection), that an investor cannot hold in a regular IRA.

13.     SDIRAs are generally only available through specialized firms that provide administrative services and act as, or work with, an IRA custodian.

14.     These SDIRA custodians and administrators are responsible for holding title to and administering the assets in their clients' SDIRA accounts.

15.     Fees for SDIRAs may be significantly higher than those for other types of investment accounts. In addition to transaction fees, there may be account opening fees, annual account fees, administrative fees, and asset-specific fees for the account.

16.     SDIRAs are largely unregulated.

### *Precious Metals SDIRA's in Particular*

17.     A precious metals SDIRA, in particular, involves as many as four different entities: (1) an SDIRA custodian, (2) an SDIRA administrator, (3) a precious metals dealer, and, critical to this matter, (4) a precious-metals depository.

18.     The precious metals SDIRA custodian holds title to the precious metals in the SDIRA and is responsible for executing all movement of assets.

19.     The precious metals SDIRA administrator is responsible for all paperwork and filings related to the SDIRA, account maintenance, reviewing transactions to make sure they meet the custodian's standards, producing account statements, and managing all data and reporting for the SDIRA.

20.     The SDIRA administrator "develops a relationship with a custodian to fully execute the transactions, since the custodian will hold the funds and/or investments." Jaime Raskulinecz, *Administrator v. Custodian: Who Does What for Self-Directed Retirement Plans?*, Forbes Financial Council (Aug. 31, 2021), https://www.forbes.com/sites/forbesfinancecouncil/2021/08/31/administrator-vs-custodian-who-does-what-for-self-directed-retirement-plans/?sh=601bbb255fbd.

21.     The precious metals dealer is a company regularly engaged in the buying and selling of precious metals.

22.     Finally, the precious metals depository is, typically, a third-party storage facility that, in exchange for a fee, safely stores and secures different types and forms of precious metals. Because the IRS specifies that a precious metals SDIRA investor cannot hold the precious metals in the investor's own home or safe-deposit box, it is necessary to use a precious metals depository for the investor to obtain the preferential tax treatment given to IRAs.

***New Direction Precious-Metals SDIRAs***

23.     NDIRA was an SDIRA administrator; Mainstar Trust was an SDIRA custodian; and ND Trust was both an SDIRA administrator and custodian.

24.     According to the New Direction website, in 2003, NDIRA opened for business in Colorado as an independently owned franchise of a national retirement investments provider.

25.     Over the next several years, NDIRA's assets under administration grew to over $300 million.

26.     In 2011, NDIRA dissolved its relationship with its franchisor and became an independent national brand with marketing capabilities throughout the United States.

27.     By 2014, NDIRA's assets under administration had reached $1 billion.

28.     Originally, the custodian for NDIRA's clients' SDIRAs—including Plaintiffs'—was Mainstar Trust, an Onaga, Kansas-based bank and trust company.

29.     In the fourth quarter of 2018, a new company, ND Trust, sent a letter to NDIRA clients letting them know that ND Trust would be taking over as their SDIRA custodian, replacing Mainstar Trust, and that NDIRA would be operating under the name of the new company.

30.     According to New Direction's website, in 2018 "New Direction IRA became New Direction Trust Company, a Kansas-regulated non-depository trust company based in Overland Park, Kansas, with administrative offices in Louisville, Colorado."

31.     ND Trust therefore appears to have served as both administrator and custodian of Plaintiffs' SDIRAs since at least October 2018.

32.     ND Trust's Articles of Incorporation on file with the Kansas Secretary of State's office identify its "Nature of Business" as follows, including but not limited to "buy[ing] and sell[ing] . . . gold, silver, coin or bullion":

i.      To receive for safekeeping personal property of every description;
ii.     to act as a custodian, designee, transfer agent, or registrar;
iii.    to act as attorney in fact in any agreed upon capacity
iv.     to receive money for investment in real or personal property of every kind and nature;
v.      to buy and sell foreign or domestic exchange, gold, silver, coin or bullion and;
vi.     to act as an escrow agent in any agreed upon capacity.

33.     New Direction's website similarly describes its business as "receiv[ing] for safekeeping personal property of every description," "to act as a custodian," "to receive money for investment in real or personal property of every kind and nature," and "to buy and sell foreign or domestic gold, silver, coin, or bullion."

34.     ND Trust boasts that it now manages $3.7 billion in assets spread across several platforms, including SDIRAs of various types.

35.     ND Trust and NDIRA are owned and operated by the same individuals.

36.     Mainstar Trust and ND Trust share the same office in Kansas, and the individual named as Mainstar Trust's registered agent, Bradley Scafe, is an incorporator of ND Trust and served, or still serves, on the board of ND Trust.

***Plaintiffs Invest with New Direction***

37.     Plaintiffs own New Direction precious-metals SDIRAs and used First State Depository as the depository for their precious metals.

38.     Plaintiff Theriault's initial investment in his precious-metals SDIRA was over $300,000, which he rolled over from his employer-sponsored 401k plan.

39.     Plaintiff Weigel's initial investment in his precious-metals SDIRA was $54,000, which he rolled over from a traditional IRA.

40.     During the relevant period, NDIRA served as administrator of Plaintiffs' SDIRAs, Mainstar Trust served as custodian, and ND Trust served as both administrator and custodian.

***New Direction Introduces Plaintiffs to First State Depository***

41.     When Plaintiffs and others like them sought to open a precious metals SDIRA, New Direction represented to them that, due to federal tax laws, SDIRA precious metals must be stored at a depository where they will be safely locked away and insured.

42.     New Direction provided Plaintiffs with a short list of depositories to choose from.

43.     When Plaintiffs opened their precious-metals SDIRAs, First State Depository ("FSD") was on New Direction's short list, and Plaintiffs chose it as their SDIRA's depository.

44.     Each year, New Direction billed Plaintiffs for a host of different fees charged by New Direction and FSD, which fees Plaintiffs paid in reliance on the representations of New Direction and FSD that their SDIRA account balances were as stated in the statements they received from New Direction and in reliance that their precious metals were, in fact, on deposit with and being maintained, securely, by FSD.

***First State Depository***

45.     FSD's website describes it as a "private depository" that offers "a full range of precious metals custody, shipping and accounting services to both commercial and individual participants in the rare coin and precious metals markets."

46.     FSD provided depository storage services to a wide variety of clients, including precious-metals SDIRAs.

47.     FSD has never been registered with the Commodity Futures Trading Commission ("CFTC") in any capacity.

48.     FSD purported to hold secure and protect the physical assets of its clients and made such representations to Plaintiffs.

49.     FSD claimed to carry insurance sufficient to cover all physical assets stored at its depository and made such representations to Plaintiffs.

50.     In its holdings election forms, FSD invoked the name of New Direction and represented that its fees would be included in the annual invoice clients would receive from New Direction, and FSD mandated that all payments must be made to New Direction.

51.     For years after Plaintiffs opened their New Direction precious metals SDIRAs, New Direction annually invoiced Plaintiffs for FSD's services, Plaintiffs paid those invoices, and New Direction provided annual holdings reports confirming that the precious metals were safely on deposit, locked away and insured at FSD.

52.     Indeed, New Direction even issued January 1, 2022 through December 31, 2022 holdings reports to Plaintiffs representing that all of their SDIRA-owned precious metals were safely on deposit at FSD.

53.     New Direction also invoiced Plaintiffs for both FSD's "depository fee" and New Direction's "annual administration fee" for 2022.

***The CFTC's Lawsuit Against FSD and Its Owner, Robert Higgins***

54.     In November 2019, the CFTC issued a subpoena to FSD as part of an investigation into another company that had been accused of financial wrongdoings.

55.     At some point on or soon after issuing its first subpoena to FSD in November 2019, the CFTC's investigation began to focus on FSD's financial dealings.

56.     In January and July 2020, the CFTC issued new subpoenas to FSD.

57.     FSD's response to all three subpoenas was so insufficient (FSD simply did not respond to the July 2020 subpoena) that the CFTC sought a show cause order compelling complete responses to the subpoenas.

58.     Despite FSD's obstruction, the CFTC continued its investigation of FSD and ultimately uncovered that FSD had stolen or otherwise misappropriated up to $110.4 million of its clients' assets, with most of that total coming from stolen gold and silver.

59.     90% of the missing gold and silver was owned by SDIRAs.

60.     A disproportionately large concentration of those SDIRAs—50%— were owned

by New Direction's clients.

61.     The CFTC filed suit against FSD, the Argent Asset Group, LLC, and Robert Leroy Higgins (the owner and operator of both entity defendants) on September 27, 2022, in The United States District Court for the District of Delaware, and the case is styled *Commodity Futures Trading Commission v. First State Depository Company, LLC, Argent Asset Group LLC, and Robert Leroy Higgins*, Case No. 1:22-cv-01266 ("CFTC Lawsuit").

62.     In that lawsuit, the CFTC alleged that the defendants violated the Commodity Exchange Act and CFTC regulations and engaged in fraudulent and deceptive schemes regarding the purchase, receipt, storage, and exchange of precious metals.

63.     Among other things, FSD and its co-defendants:

    a.   Misappropriated clients' funds and assets;

    b.   Led clients to believe that their precious metals were held at FSD;

    c.   Deceived clients about their assets when the clients sought to transfer or obtain possession of their precious metals; and

    d.   Deceived clients about the amount and existence of insurance coverage held by FSD, including falsely telling clients that FSD's insurance insured the client's assets at 100% of their value.

64.     The CFTC Lawsuit sought restitution, disgorgement, civil monetary penalties, permanent trading and registration bans, and a permanent injunction.

65.     Upon information and belief, New Direction had knowledge of all of the foregoing before or close in time to when the CFTC learned of FSD, Argent Group, and Mr. Higgins' illegal activities, yet New Direction did nothing to alert its clients, like Plaintiffs, whose SDIRAs' precious metals were supposedly on deposit with FSD.

***The FSD Receivership***

66.     Within two days of the CFTC Lawsuit being filed, the Delaware district court

entered a restraining order freezing assets controlled by FSD, and the other named defendants and appointed Dallas-area attorney Kelly Crawford as the temporary receiver for those assets.

67.     The receiver took possession and control of FSD and enlisted an accounting firm (Baker Tilly) to inventory and assess FSD's assets.

68.     The receiver set up a publicly available website with information about the CFTC Lawsuit and the receivership, including the accounting firm's reports and supplements thereto: https://fsdreceivership.com/

69.     The accounting firm's report identified discrepancies in 1,006 New Direction IRAs that were supposedly secured, insured, and stored by FSD.

70.     Those discrepancies fell into three general categories:

     a.   The account exists, but with partially intact assets on deposit at FSD;

     b.   The account exists, but with no assets at all on deposit at FSD; or

     c.   The account should exist in FSD's books but does not appear at all.

***Plaintiff Theriault is Contacted by the FBI, But New Direction Refuses to Help***

71.     During 2022, and before the CFTC Lawsuit was filed, an FBI agent out of the Wilmington, Delaware office contacted Plaintiff Theriault, telling him that there was an investigation underway regarding misappropriation of precious metals that were supposed to be on deposit at FSD.

72.     The FBI agent warned Theriault that it appeared he may be one of the victims.

73.     Upon information and belief, New Direction was well aware, on notice, and had reason to know of the investigation into FSD's apparent misappropriation of their SDIRA clients' precious metals, but it did not warn Plaintiffs or any of its other clients.

74.     Theriault immediately began communicating with New Direction about moving his account's precious metals from FSD to another depository and filled out the forms New Direction

11

told him were necessary to accomplish the transfer.

75.     New Direction dragged its feet in responding to Theriault's requests for information.

76.     FSD provided Theriault with a document showing that his SDIRA's precious metals had been shipped to the new depository, per his request, but FSD in reality had not transferred the precious metals.

77.     New Direction never transferred the precious metals as directed by Theriault.

78.     Plaintiff Weigel had no reason to question whether his SDIRA's precious metals were safely stored at FSD State until he received a letter informing him of the CFTC Lawsuit and resulting receivership in early 2023.

***New Direction Promotes and Prefers FSD, Without Disclosing Their Special Relationship***

79.     When Plaintiffs chose FSD as their depository, they did so because New Direction said a depository was necessary, New Direction represented the precious metals would be safely locked away and insured at the depository, and New Direction included FSD on a list of preferred depositories to choose from.

80.     New Direction's precious-metals materials and education resources inform clients that the law requires an SDIRA's precious metals to be stored at a depository "where they will be safely locked away and insured." *What should you know about investing in Precious Metals?*, ndtco.com, https://ndtco.com/precious-metals/ (last visited Apr. 23, 2023).

81.     New Direction's materials and educational resources include precious-metals FAQs such as the below:



82.     New Direction also represented that it was not affiliated with any precious-metals depositories, including those included on the depository list it provided new clients.

83.     In reality, the CEOs/principals of FSD (Robert Higgins) and New Direction (William Humphrey) have been friends outside of work and within the industry for many years and their companies have long enjoyed a close business relationship.

84.     Higgins, Humphrey, and others at FSD and New Direction dined and socialized with one another at various trade shows (often called "coin shows") while also engaging in business collaborations.

85.     Their relationship included, among other things, a mutually beneficial cross-referral arrangement.

86.     As part of that arrangement, New Direction steered its clients toward FSD by, among other things, including FSD on its list of depository options; touting Mr. Higgins' reputation and expertise in the metal-dealing business; recommending, verbally and/or by email, using FSD as the client's depository; telling some clients that the client's chosen metal dealer

would not ship to any depository other than FSD even though that statement is not accurate; and representing to clients that FSD would keep their precious metals safely locked away and insured.

87.     As an additional example of their mutually beneficial referral arrangement, for a time period starting in, at latest, 2010, FSD was one of only two, or few, depositories expressly listed as depository options on New Direction's precious-metals SDIRA forms and resources.

88.     In providing this list to Plaintiffs (and others similarly situated), New Direction represented to them that the listed depositories met the IRS rules and were heavily insured.

89.     In exchange for New Direction pushing clients its way, FSD would recommend New Direction to people looking to invest in precious metals through an IRA.

90.     New Direction never disclosed its referral arrangement or close, special relationship with FSD to Plaintiffs or any other similarly situated New Direction clients.

91.     Despite knowing, or having reason to know, that knowledge of its referral arrangement and close relationship with FSD would justifiably have caused Plaintiffs to distrust FSD, be less likely to choose FSD, more closely scrutinize FSD, or more closely monitor FSD if nevertheless selected, New Direction failed to disclose its referral arrangement and special relationship with FSD to Plaintiffs before (or after) Plaintiffs funded their SDIRAs.

92.     New Direction had an obligation to disclose its referral arrangement with FSD to Plaintiffs.

93.     New Direction represented to Plaintiffs that it did not endorse or recommend any depository and was not affiliated with any depository.

94.     Plaintiffs reasonably relied on that representation when choosing FSD as a depository.

95.     As to FSD, those representations were false. New Direction had a referral arrangement with FSD in which New Direction included FSD on its short list of depositories and engaged in other tactics to steer clients, including Plaintiffs, toward using FSD as depository.

96.     Upon information and belief, New Direction trained staff to push precious-metals SDIRA clients toward the few depositories with which NDIRA had pre-existing contractual relationships—such as FSD—despite advertising that said clients could use any depository they wanted.

97.     Further, upon information and belief, New Direction told some clients that FSD was their only option when, in reality, it was not.

98.     Indeed, despite its written materials claiming otherwise, New Direction went so far as to strongly recommend FSD to some SDIRA clients and recommend no other depository.

99.     New Direction knew, or should have known, that its representations of impartiality about, and independence from, depositories was false and would be misleading to Plaintiffs and other precious-metals SDIRA clients like them.

100.    New Direction's failure to disclose its referral arrangement and close relationship with FSD caused Plaintiffs (and others like them) to incur damages.

101.    If New Direction had disclosed its referral arrangement with FSD, then Plaintiffs would have been skeptical of FSD, would have scrutinized FSD more closely, would not have chosen FSD as depository or would have more closely monitored FSD and New Direction and would not have lost precious metals due to FSD's misappropriation, fraud, and theft.

### *New Direction's Misrepresentations Regarding FSD's Insurance Coverage*

102.    New Direction informed Plaintiffs (and all other similarly situated clients) that any depository acceptable, by law, to store their precious metals must be secure and heavily insured.

103. Thus, when New Direction provided Plaintiffs and other similarly situated clients with a list of potential depositories, it undertook the responsibility to ensure that the depositories it listed as options for precious-metals SDIRA clients, including Plaintiffs, were not only secure but also carried sufficient insurance to cover said clients' assets.

104. By including FSD on the list of depositories provided to Plaintiffs, New Direction represented to Plaintiffs, and Plaintiffs reasonably understood New Direction to represent, that it had confirmed that FSD was both secure and heavily insured.

105. When choosing which depository to use, Plaintiffs reasonably relied on these representations.

106. New Direction knew or should have known that its approval of certain depositories necessarily meant that it represented to customers that New Direction had determined that said depositories were secure and carried sufficient insurance to protect Plaintiffs' SDIRAs and New Direction's other precious-metal SDIRA clients.

107. Thus, New Direction knew or should have known that it had undertaken an obligation to perform a service that was necessary to protect Plaintiffs' assets and the assets of its other precious-metal SDIRA clients.

108. New Direction failed to exercise reasonable care to determine whether FSD was in fact a secure depository.

109. New Direction failed to exercise reasonable care to determine the true amount and nature of insurance carried by FSD.

110. Upon information and belief, New Direction either knew or should have known that FSD was, in fact, not fully insured.

111.    During the timeframe reviewed by the CFTC (2014 through 2022), the CFTC determined that FSD had never carried enough insurance to provide 100% coverage for each client, nor did FSD ever carry enough insurance to cover the total value of its deposits. To the contrary, FSD often carried far less insurance coverage than needed to cover its reported deposits.

112.    If New Direction conducted any inquiry into FSD's security and insurance coverage before representing that FSD was sufficiently insured and secure, that inquiry was not reasonable or reasonably performed. It was not reasonable for New Direction to simply rely on FSD's representations.

113.    New Direction should have scrutinized the insurance carried by FSD and learned that FSD was not fully insured; as a result, New Direction should not have included FSD on a list of depositories; and New Direction should have warned any of its SDIRA accountholders with precious metals already on deposit at FSD that FSD was not properly insured.

114.    Had New Direction taken reasonable care to determine the true amount and nature of the insurance carried by FSD and/or confirmed said insurance coverage by asking FSD for, and then scrutinizing, certificates of insurance, it would have learned that FSD's insurance coverage was not sufficient to insure Plaintiffs' assets and that neither New Direction nor its precious-metals SDIRAs were listed as insureds on certificates of insurance.

115.    On information and belief, the agreement between New Direction, Mainstar Trust, and FSD entitled New Direction and Mainstar Trust to proof of FSD's insurance coverage and limits.

116.    Had New Direction taken such steps, Plaintiffs either never would have had any relationship with FSD to begin with or would have ceased their relationship with FSD, transferred

their SDIRAs' assets to a different depository, and therefore would not have suffered any loss due to FSD's malfeasance.

117.   FSD purported to insure depositors' assets at 100%, whereas other depositories claim to insure a lesser percentage of depositors' assets. For example, at least one depository competing with FSD only carried insurance sufficient to cover 70% of its depositors' assets.

118.   New Direction's failure to exercise reasonable care increased the risk that Plaintiffs would choose FSD as a depositor and not have sufficient insurance coverage for their precious metals through FSD.

119.   Plaintiffs reasonably relied on New Direction's representation that it determined FSD was sufficiently insured to protect Plaintiffs' precious-metals assets.

120.   Plaintiffs were damaged by New Direction's breach because, if New Direction had taken reasonable care in its representations to Plaintiffs and instead accurately communicated to Plaintiffs that it had not confirmed that FSD was heavily/properly insured, Plaintiffs would not have relied on New Direction's representations and would have scrutinized FSD's insurance representations more closely themselves and chosen a different depository.

***New Direction Hides Concerns About Its Friends at FSD***

121.   At some point prior to or contemporaneous with the FBI raid and/or CFTC investigation, New Direction knew or should have known of concerns regarding whether FSD was safely securing and storing its clients' precious metals.

122.   Long before the CFTC Lawsuit was filed, New Direction's precious metals group was discussing the need to monitor and safeguard its clients against fraud by depositories but had failed to take reasonable and necessary steps to provide such monitoring, tracking, and reporting.

123.    The precious metals group—as industry insiders with greater knowledge about depositories and precious-metals SDIRAs than the general public—was aware that New Direction needed to provide more monitoring and safeguards to ensure that clients' precious metals were actually being received, and recorded as such, by depositories like FSD. For example, despite protestations to the contrary, New Direction undertook audits (internally called depository reconciliation) to determine whether New Direction had, for instance, received confirmation from a depository that it had received the New Direction client's precious metals and funded their accounts.

124.    Upon information and belief, during the course of its referral relationship with FSD, New Direction failed to disclose to Plaintiffs and other similarly situated clients important facts and concerns about FSD yet continued to provide Plaintiffs and other similarly situated clients with annual holding reports as if New Direction did not know that reason existed to question the validity/accuracy of those reports. Examples of such facts include but are not limited to the following:

     a.   Prior to the CFTC Lawsuit being filed, New Direction performed audits of its clients' SDIRAs and found that FSD had received some clients' precious metals—according to the shipping company—but had not sent New Direction confirmation of receipt, and despite requests from New Direction, FSD never sent said confirmation;

     b.   The same routine audits also informed New Direction that FSD had failed to provide confirmation that it had credited some SDIRA owners' accounts upon receipt of their precious metals and again, despite request from New Direction, FSD never sent said confirmation;

     c.   FSD had stopped sending annual holding reports to New Direction for some New Direction clients' SDIRAs (some as far back as 2018) and so New Direction's annual holding reports in such cases were not based on information obtained from FSD as required; and

     d.   FSD would unduly delay responding – or fail to respond altogether – to inquiries from New Direction when the foregoing and other issues of concern arose.

125.    Again, New Direction did not inform Plaintiffs or other similarly situated clients of these concerning facts.

126.    Plaintiffs did not, and could not, know of these withheld facts until they retained counsel to investigate and pursue this action.

127.    At some point, without disclosing FSD's issues and problems to Plaintiffs or other similarly situated clients, New Direction created an undisclosed webpage on which it listed certain precious-metals depositories and dealers, as well as other investment companies, with which New Direction would no longer do business because it had deemed them "administratively infeasible." *Administratively Infeasible Companies*, ndtco.com, https://ndtco.com/administratively-infeasible/ (last visited Aug. 22, 2023).[2]

128.    At some point, New Direction placed FSD and Higgins' other, related company, Argent Asset Group, LLC,[3] on that list.

129.    New Direction's administratively infeasible list contains a large number of companies accused or found guilty of fraud, embezzlement, and similar criminal and tortious acts.

130.    The webpage admonishes clients to review the list to be sure that the company they wish to work with is not on it.

131.    But Defendants never told Plaintiffs about any such list, FSD being on that list, its determination that FSD had become administratively infeasible, or about the existence of a webpage identifying FSD as such.

---

[2] To view an archived version of this webpage as it existed on August 22, 2023, use this link: https://web.archive.org/web/20230822122251/https://ndtco.com/administratively-infeasible/
[3] Argent Asset Group, LLC is often referred to—even in its own materials—as The Argent Group.

132.   A person cannot navigate to the New Direction webpage containing the administratively infeasible list without running a keyword search in the website's internal search bar.

133.   In addition, and upon information and belief, at some point as early as 2020, New Direction received information from the FBI or learned of an FBI investigation that revealed, or should have been understood to reveal, causes for concern about FSD.

134.   Upon receipt of this information, New Direction should have notified and warned Plaintiffs and its other similarly situated clients that their retirement savings held in their New Direction SDIRAs may not be safe.

135.   Despite all of the foregoing, New Direction continued to send annual holding reports to Plaintiffs and other similarly situated accountholders as if all their precious metals continued to be safely stored at FSD.

*New Direction's Failure to Audit Plaintiffs' Precious-Metals SDIRAs Held at FSD*

136.   New Direction had master agreements with certain depositories that included, among other things, the right to enter the depository and audit and inspect any of their clients' precious metals.

137.   Upon information and belief, New Direction either did have or should have had such an agreement with FSD and should have, in fact, performed physical audits of the precious-metals holdings at FSD.

138.   Upon information and belief, to the extent any audits of FSD were performed, they were not adequate or revealed cause for concern. For example, FSD did not respond, unduly delayed its response, or provided a response with manifest discrepancies between what was supposed to be stored at FSD and what was actually at FSD.

139.     A reasonable SDIRA administrator or custodian would have undertaken physical audits and would have instituted further monitoring and security measures and required restricted access to its clients' precious metals so as to ensure safekeeping of Plaintiffs and other similarly situated clients' assets and prevent or minimize the chances of FSD doing what it did.

140.     But New Direction looked the other way and did not impose such requirements on FSD, with whom it had an undisclosed cordial and chummy referral relationship.

***New Direction's Failure to Provide Accurate Annual Holdings Reports***

141.     Plaintiffs relied on the annual holdings reports provided to them by New Direction to confirm not only the value of their SDIRAs but also the amount of precious metals held by their SDIRAs and that said metals had been received and credited to their accounts at FSD.

142.     Per its own policies, New Direction was Plaintiffs only source of information about their precious-metals SDIRA's holdings, status, value, and anything else Plaintiffs could want to know.

143.     Indeed, New Direction's website states as much: "all depository interactions must go through ND Trust." *Choosing a Precious Metals Depository*, ndtco.com, https://ndtco.com/precious-metals-depository/ (last visited Apr. 23, 2023).

144.     New Direction thus undertook the responsibility of annually providing Plaintiffs (and all other precious-metals SDIRA clients with metals sent to FSD) with statements showing the then-current market value of their precious-metals SDIRAs and the total amount of their SDIRAs' precious-metals stored at FSD.

145.     New Direction failed to fulfill this responsibility, leading Plaintiffs and other similarly situated clients to lose their retirement savings.

*Plaintiffs' Net Losses to Date*

146.    Plaintiffs each timely filed proofs of claim with the FSD Receiver.

147.    The Receiver assigned Plaintiffs' claims numbers and categorized them among the "compromised category (holdings are missing)."

148.    The Receiver filed various status and other reports regarding the process followed by the Receiver in marshalling the still available FSD holdings and distributing them appropriately to depositors, such as Plaintiffs.

149.    The Receiver also reported on efforts to identify and liquidate assets in receivership, including the use of metal detectors to search the home of Higgins and the discovery of precious metals being hidden by Higgins there, documents seized from Higgins' home showing that he was recently selling precious metals, foreign currency, the Hummers driven by Mr. Higgins and his wife, coins and other valuable owned by Argent Asset Group, accounts receivable, etc.

150.    The Receiver estimates that over $40 million of assets have been transferred from the depository to claimants.

151.    Despite the Receiver's efforts, Plaintiffs continue to be out the lion's share of their original investments, as well as the additional value they should have realized on those investments.

152.    At this juncture, Plaintiff Theriault has been able to transfer out from the Receiver roughly a third of the cash value of his original investment, and the Receiver has recorded Plaintiff Weigel's net loss at $63,200.

153.    More than $78 million in precious metals and currency remain missing from the depository operated by FSD.

154.    According to the Receiver, this is the single largest theft from a depository in the history of the United States.

155.    Approximately half of the stolen and still missing precious metals are those of New Direction SDIRA accountholders like Plaintiffs – precious metals that New Direction repeatedly reassured its SDIRA accountholders were safely secured at FSD.

## CAUSES OF ACTION

## Count One: Fraud

156.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

157.    As detailed above, New Direction made false (or untrue) representations as a statement of existing and material fact, including but not limited to the following:

    a.  That New Direction was independent from and not affiliated with any precious metals depository;

    b.  That New Direction was impartial and not preferential when it came to the selection of a depository.

    c.  That New Direction was and independent from and did not have a relationship with FSD;

    d.  That FSD was a suitable and appropriate depository;

    e.  In some cases, that FSD was the only depository that was an option;

    f.  That Plaintiffs' SDIRAs' precious metals would be safely locked away and insured at the depository;

    g.  That Plaintiffs' SDIRA precious metal deposits would be monitored and tracked;

    h.  That the SDIRA account statements Plaintiffs received from New Direction were accurate;

    i.  That there were no concerns regarding FSD;

    j.  That FSD was administratively feasible; and

      k.  That FSD was adequately insured.

158.    These representations were known to be false (or untrue) by New Direction or were recklessly made without knowledge concerning them.

159.    These representations were intentionally made for the purpose of inducing another party to act upon them.

160.    These representations were material in that they were so substantial as to influence Plaintiffs.

161.    Plaintiffs reasonably relied and acted upon these representations.

162.    Plaintiffs sustained damages by relying upon these representations.

## Count Two:  Fraud Through Silence

163.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

164.    New Direction had knowledge of material facts which Plaintiffs did not have and which Plaintiffs could not have discovered through the exercise of reasonable diligence, including but not limited to the following:

      a.  That New Direction and FSD had a referral relationship;

      b.  That the principals of New Direction and the principals of FSD, including Robert Higgins, had a referral relationship and friendships;

      c.  That New Direction was not impartial when it came to the selection of a depository and, in fact, exercised preferential treatment towards FSD and Higgins;

      d.  That New Direction had, in fact, trained its staff to push precious metals SDIRA clients towards FSD;

      e.  That FSD was not, in fact, monitoring, tracking and reporting on Plaintiffs' actual SDIRA precious metals deposits;

      f.  That FSD was not, in fact, adequately and fully insuring accounts;

g.  That there were reasons to be concerned about whether FSD and Higgins were in fact safely securing Plaintiffs' and other SDIRA precious metals deposits, including but not limited to the following:

    i.  FSD was sometimes failing to provide timely or authentic confirmation that precious metals had been received and were on deposit;

    ii.  FSD was sometimes failing to provide timely or authentic confirmation that a clients' account had been funded;

    iii.  FSD was sometimes not sending any confirmation or account statement at all; and

    iv.  FSD was sometimes delaying response – or not responding at all – to inquiries.

h.  That FSD was, in fact, administratively infeasible;

i.  That New Direction had included FSD on a list of "administratively infeasible" companies; and

j.  That New Direction had received information from the FBI and others revealing causes for concern about FSD.

165.  New Direction was under an obligation to communicate these material facts to Plaintiffs.

166.  New Direction intentionally failed to communicate to Plaintiffs these material facts.

167.  Plaintiffs justifiably relied upon New Direction to communicate these material facts, including but not limited to the existence of the relationships between New Direction and FSD (and their principals), and, if the relationship had been disclosed, then Plaintiffs either would not have chosen FSD as depository or would have more closely monitored FSD.

168.  Plaintiffs sustained damages as a result of New Direction's failure to communicate these material facts to Plaintiffs.

## Count Three:  Negligence Against Defendants

169.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

***Failure to Provide Accurate Annual Holdings Reports***

170.     New Direction undertook the responsibility of annually providing Plaintiffs (and all other precious-metals SDIRA clients with metals sent to FSD) with holding reports showing the then-current market value of their precious-metals SDIRAs and the total amount of their SDIRAs' precious-metals stored at FSD.

171.     New Direction knew or should have known that Plaintiffs and its other precious-metals SDIRA clients would reasonably rely on the annual holdings reports provided to them by New Directions to reflect the actual amount of each kind of precious metal held in their SDIRAs on the date(s) shown on the annual report.

172.     New Direction did not take reasonable steps to obtain and verify the information required to provide Plaintiffs (and other similarly situated clients) with annual holdings reports that reflect the actual amount of each kind of precious metal held in their SDIRAs on the date(s) shown on the annual report.

173.     New Direction therefore breached its duty to provide Plaintiffs and its other precious-metals SDIRA clients accurate annual report showing how much their metals were worth and reporting the actual amount of each type of precious metal held in their SDIRAs by FSD on the date(s) shown on the annual report.

174.     Plaintiffs reasonably relied on New Direction's undertaking to obtain accurate and true annual holdings information from FSD.

175.    New Direction's breach caused Plaintiffs to incur damages by failing to report the actual amounts of precious metals held by FSD for Plaintiffs, and the market value thereof.

*Failure to Audit FSD's Facility*

176.    New Direction knew or should have known that a visual audit and/or inspection of the actual physical holdings of FSD, either through an in-person visit to the FSD facility or through readily available remote/virtual means, was necessary for protection of Plaintiffs and other clients.

177.    As their only source of account information, Plaintiffs reasonably relied on New Direction to audit and inspect their precious metals held by FSD.

178.    Upon information and belief, New Direction failed to conduct any in-person physical audit of the FSD facility or any video surveillance or other remote monitoring or auditing of the FSD facility.

179.    New Direction therefore breached its duty to audit and inspect those holdings.

180.    New Direction's breach caused Plaintiffs to suffer damages by failing to verify and report the actual amounts of precious metals held by FSD for Plaintiffs, and the market value thereof.

181.    In the alternative, Mainstar Trust was responsible, either in place of or as well as New Direction, for the obligations and duties—and breaches thereof—alleged in the foregoing paragraphs.

## Count Four: Negligent Misrepresentation Against New Direction

182.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

183.    As detailed in the foregoing paragraphs, New Direction supplied false information, for the guidance of Plaintiffs and their other clients in their business transactions, regarding FSD and its relationship with FSD.

184.    In supplying this false information, New Direction failed to exercise reasonable care or competence in obtaining or communicating the false information.

185.    Plaintiffs relied on this false information from New Direction and were among the group of persons for whose benefit and guidance the information was supplied.

186.    Plaintiffs sustained damages as a result of New Direction's negligently supplying the false information.

### Count Five:  Negligent Nondisclosure Against NDIRA

187.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

188.    As detailed in the foregoing paragraphs, New Direction failed to disclose to Plaintiffs facts regarding FSD and regarding its relationship with FSD that New Direction knew might justifiably induce Plaintiffs to act or refrain from acting in a business transaction.

189.    NDIRA represented to Plaintiffs that it did not endorse or recommend any depository and was not affiliated with any depository.

190.    Those representations were ambiguous or, at best, only partial and were misleading because, in reality, NDIRA[4] had a referral arrangement with FSD in which NDIRA pushed its precious-metals SDIRA clients toward FSD using various tactics previously discussed, such as but not limited to, training NDIRA staff to push precious-metals SDIRA clients toward the few depositories it had pre-existing contractual relationships—such as FSD—despite advertising that

---

[4] After October 2018, the allegations in this section apply to ND Trust's actions as well.

29

said clients could use any depositor they wanted and even telling clients that FSD was their only option when, in reality, it was not.

191.    NDIRA knew, or should have known, that its representations of impartiality about, and independence from, depositories was ambiguous, or at best partial, and would be misleading to Plaintiffs and other precious metals SDIRA clients like them.

192.    NDIRA negligently failed to disclose its referral arrangement with FSD and thereby caused Plaintiffs, and other precious-metals SDIRA clients like them, to incur damages.

193.    If NDIRA had disclosed its referral arrangement, Plaintiffs would not have chosen FSD as their depository or would have more closely monitored FSD and New Direction and so would not have lost their precious metals to FSD's misappropriation, fraud, and theft.

### Count Six:  Breach of Fiduciary Duties Against Defendants

194.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

195.    Plaintiffs entered into a business relationship with Defendants under which Plaintiffs entrusted their precious-metals SDIRAs to it.

196.    In so doing, Plaintiffs placed trust and confidence in Defendants to manage, secure, insure, and maintain their SDIRAs and the precious metals therein, to tell Plaintiffs the truth, to disclose to Plaintiffs any special relationships with depositories and any other relevant parties, to not mislead Plaintiffs, and to provide the services Defendants claimed they would provide to Plaintiffs.

197.    Defendants had the duty to act in good faith and with due regard to the interests of Plaintiffs.

198.    Defendants had the duty to act with good faith and loyalty to Plaintiffs' interests and to not engage in self-dealing.

199.    By engaging in the conduct detailed in the foregoing paragraphs of this Complaint, including but not limited to identifying FSD as a depository and failing to disclose its relationship with FSD and failing to act and warn Plaintiffs when they knew or had reason to know that something was amiss at FSD, Defendants breached these fiduciary duties.

200.    The breaching conduct included, but is not limited to, the following:

a.  The misrepresentations detailed in the foregoing paragraphs;

b.  The failures to disclose detailed in the foregoing paragraphs;

c.  The failure to immediately notify Plaintiffs and other clients of the concerns regarding FSD; and

d.  The failure to respond or timely respond to requests from Plaintiff Theriault and other clients who asked or directed New Direction to move their SDIRA precious metals to a different depository.

201.    New Direction's fiduciary breaches caused Plaintiffs to incur damages.

### Count Seven: Violations of the Kansas Consumer Protection Act

202.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

203.    Plaintiff Weigel is an individual and citizen of Kansas and a "consumer" under the Kansas Consumer Protection Act.

204.    Each of the Defendants is a business that engages in consumer transactions in Kansas and is a "supplier" under the Kansas Consumer Protection Act.

205.    As detailed in the foregoing paragraphs, Plaintiff Weigel and New Direction entered into a disposition for value of property or services within the state of Kansas.

206.    The conduct of Defendants as detailed in the foregoing paragraphs, including the misrepresentations, failures to disclose and fiduciary breaches detailed above, constitute deceptive acts and practices under the Kansas Consumer Protection Act.

207.    Plaintiff Weigel is therefore entitled to all remedies available under the Kansas Consumer Protection Act, including attorneys' fees and expenses.

## Count Eight: Violation of the Vermont Consumer Fraud Act

208.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

209.    Plaintiff Theriault is a citizen of Vermont who purchased services from Defendants for personal use and is therefore a consumer under the Vermont Consumer Fraud Act.

210.    The conduct of Defendants as detailed in the foregoing paragraphs, including the misrepresentations, failures to disclose and fiduciary breaches detailed above, constitutes a violation of the Vermont Consumer Fraud Act.

211.    Plaintiff is therefore entitled to all remedies available under the Vermont Consumer Fraud Act, including attorneys' fees and expenses.

## Count Nine: Successor Liability Against ND Trust

212.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

213.    ND Trust is liable to Plaintiffs for any damages awarded in this case for NDIRA's actions under the theory of successor liability.

214.    ND Trust is a mere continuation of NDIRA.

215.    ND Trust's clients are the same as NDIRA's clients.

216.    On information and belief, ND Trust acquired all or substantially all of NDIRA's assets when it was created and did so without providing sufficient or reasonable consideration to NDIRA for said assets.

217.    If a person types in NDIRA's website address, she is immediately redirected to ND Trust's website.

218.    NDIRA and ND Trust share the same corporate headquarters.

219.    On information and belief, NDIRA ceased operation when ND Trust was created.

220.    ND Trust is in the same line of business as NDIRA and simply carried on NDIRA's business with the addition of a new service.

221.    ND Trust is owned and/or controlled by the same people as NDIRA.

222.    The process resulting in ND Trust acquiring NDIRA's assets and clients was negotiated or handled by the same or essentially the same people on both sides. That is, the individuals in charge of negotiating the process for ND Trust were also the people in charge of negotiating the process for NDIRA.

223.    ND Trust's acquisition of NDIRA's assets and clients was done simply for the convenience of their owners, directors, and other stakeholders that were part of that process.

224.    ND Trust has expressly represented that it is a mere continuation of NDIRA. For example, ND Trust stated as follows in a letter to NDIRA's clients dated September 18, 2018: "going forward New Direction IRA will be operating under the name New Direction Trust Company."

225.    In the alternative, ND Trust's acquisition of NDIRA's assets and clients was simply a merger or consolidation of the two entities.

226.     In light of the foregoing, ND Trust is liable to Plaintiff for any judgment against NDIRA in this action.

### CLASS ALLEGATIONS

227.     In addition to bringing this case on behalf of themselves, Plaintiffs also bring the case as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as follows ("Class Member" or "Class"):

> All New Direction IRA, Mainstar Trust, and New Direction Trust Company precious-metals IRA owners whose precious metals were supposed to be on deposit with First Sate Depository Company as of September 27, 2022, but lost some or all of the precious metals held by their IRAs due to Defendants' unlawful actions. Excluded from this class definition, however, are all New Direction IRA, Mainstar Trust, and New Direction Trust Company clients who participated only in the Silver Lease program discussed in the CFTC Lawsuit.

228.     Class certification is appropriate under Rule 23(a) and 23(b)(1), (b)(2), and/or (b)(3).

229.     The class satisfies the numerosity requirement because it is composed of hundreds of New Direction self-directed precious metals IRA accountholders.

230.     The number of class members is so large that joinder of all its members is impracticable.

231.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.

232.     All these precious-metals IRA owners victimized by FSD suffered loss through the misappropriation of their precious metals or other assets by FSD and others, New Direction' civil wrongs and failures in this regard, including its misrepresentations, fiduciary breaches, and negligence described above, and the administrative fees charged by Defendants.

233.     Common legal and factual questions include, but are not limited to:

a.   The nature of Defendants' relationship with FSD;

b.   Defendants' failure to disclose that relationship to all Class Members;

c.   Defendants' misrepresentations to all Class Members regarding the precious metals being safely secured and insured at the depository;

d.   Defendants' fiduciary duties to all of the Class Members;

e.   Defendants' negligence in monitoring and reporting on FSD and monitoring and reporting on Class Members' accounts;

f.   What Defendants knew and when Defendants knew it, as it relates to FSD and Higgins and something being amiss.

234.   Plaintiffs' claims are typical of the claims of the members of the Class because his claims, and the claims of all Class Members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

235.   Plaintiffs will fairly and adequately represent the Class and have retained counsel competent in the prosecution of complex class action litigation.

236.   Plaintiffs have no interests antagonistic to those of other members of the Class.

237.   Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of the litigation of the above-listed common issues as a class action.

238.   Plaintiffs have standing to bring this action on behalf of similarly situated individuals because they owned precious-metals SDIRAs through New Direction, their SDIRA's precious metals were supposed to be stored at FSD, but their precious metals were lost, in whole or in part, due to Defendants' unlawful conduct.

239.   Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by Class Members would create a risk of establishing incompatible standards of conduct for Defendants.

240.    In the alternative, class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

241.    In the alternative, class certification under Rule 23(b)(3) is appropriate because the above-listed questions of law or fact common to the Class predominate over individualized questions, and class action treatment is superior to the other available methods for the fair and efficient adjudication of the controversy.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as the class representatives and designation of Plaintiffs' counsel as class counsel;

C.    Actual damages in the amount of any losses Plaintiffs and the Class suffered, including but not limited to the loss of the value of Plaintiffs' precious-metals SDIRAs and the cumulative value of all of the losses to all of Class Members' affected SDIRAs;

D.    An award of pre-judgment interest;

E.    An award of penalties and attorneys' fees and costs pursuant to the applicable state consumer protection act; and

F.    Such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs designate Kansas City, Kansas as the place of trial.

Respectfully submitted by,

_/s/  Scott C. Nehrbass_
Scott C. Nehrbass, KS #16285
FOULSTON SIEFKIN LLP
7500 College Blvd. Suite 1400
Overland Park, KS 66210-4041
(P) 913.253.2144 | (F) 913.498.2101
snehrbass@foulston.com

Jeff P. DeGraffenreid, KS #15694
Alexandra N.C. Rose, KS #27247
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, Kansas 67206-4466
(P) 316.291.9716 | (F) 316.771.6011
jdegraffenreid@foulston.com
nrose@foulston.com

_Counsel for Plaintiffs and the Putative Class_