IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JOSEPH THERIAULT and WILLIAM WEIGEL,
*individually and on behalf of all those similarly situated*,

        Plaintiffs,

v.                                                                                    Case No. 23-2477-JWB

NEW DIRECTION IRA, INC., NEW DIRECTION
TRUST COMPANY, and MAINSTAR TRUST,

        Defendants.

---

CHRISTY WALLACE
*on behalf of herself and all others similarly situated*,

        Plaintiff,

v.                                                                              Case No. 24-2007-JWB

NEW DIRECTION IRA, INC., NEW DIRECTION
TRUST COMPANY, and MAINSTAR TRUST,

        Defendants.

**MEMORANDUM AND ORDER**

This matter came before the court for a summary bench trial on March 4-5, 2025, regarding Defendants' motions to compel arbitration in both the captioned cases above. (*Theriault*, Docs. 16, 24; *Wallace*, Docs. 17, 18.) Given the factual issues in dispute, the court held a summary bench trial on the limited issue of whether the parties had a valid and enforceable arbitration clause in the financial documents that governed their relationship. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the

court shall proceed summarily to the trial thereof.")  The court heard testimony from five witnesses.  The court first heard testimony from Kevin Dodson and Julia Wynne, both employed by New Direction IRA, and then heard testimony from the three named plaintiffs in these matters, Christy Wallace, William Weigel, and Dr. Joseph ("Gil") Theriault.  After hearing all testimony, the court took the motions to compel arbitration under advisement.  The court now provides factual findings and conclusions of law relevant to ruling on these motions.

I.     Facts

After hearing testimony and receiving exhibits into evidence, the court finds the following facts based on a preponderance of the evidence.

Defendants New Direction IRA and New Direction Trust Company provide account administration and custodian services for self-directed Individual Retirement Accounts ("IRA").[1] New Direction offers both traditional and Roth self-directed IRAs, each of which permits account holders a tax-privileged way to hold alternative assets, such as private equity, real estate, and precious metals.  Given that New Direction is a nonfiduciary and does not secure any assets of their account holders, their business consists of keeping records, preparing all mandatory IRS reports, and passively holding title to the account holder's assets.  To create an account with New Direction, an applicant must download an application from the New Direction website. (*See, e.g.*, Trial Ex. 42.)  This application includes the prospective account holder's personal information, a list of "acknowledgments & agreement to terms," and contains a signature page.  The signature page acknowledges that the prospective account holder has reviewed the fee schedule and disclosures, and also acknowledges receipt of the plan agreement and disclosure statement. (Trial Ex. 1, 12, 21.)  Although New Direction does not provide a plan agreement on its joint website,

---

[1] For notation purposes, the court will use the blanket term "New Direction" to refer to both New Direction IRA and New Direction Trust Company when they act together and will use the specific company name for individual analysis.

New Direction maintains that the Custodial Agreement and Disclosure Statement document, which can be downloaded from its website, is the plan agreement referenced in the application rather than the "acknowledgments & agreement to terms" in the application itself.

The statutory authority to create self-directed IRAs comes from 26 U.S.C. § 408(a), and these accounts are subject to certain formation requirements under Treasury Regulation 26 C.F.R. § 1.408-6. To open an IRA custodian trust account, the prospective account holder must complete IRS Form 5305-A, which contains seven basic Articles (which includes mandatory language from the IRS) and an eighth Article which is left open for the account custodian or administrator to add additional contractual language.[2] A signature is also required. New Direction incorporates this required account language into its Custodial Agreement and Disclosure Statement document and considers the signature on the account application as the de facto ratification of Form 5305-A for purposes of creating a tax-advantaged account.

New Direction IRA was originally created as a franchise of Entrust Group in 2003 (and was called Entrust Group New Direction at that time). However, Entrust Group changed their business model in 2011 and allowed Bill Humphrey and Katherine Wynne to purchase the New Direction IRA franchise. Thereafter, Mainstar Trust became the custodian of the accounts while New Direction IRA existed as a third-party administrator. In 2018, New Direction Trust Company was founded to become the custodian for New Direction IRA accounts in response to changing market conditions and competitor behavior, and Mainstar Trust transferred title for these accounts to New Direction Trust Company. (Trial Ex. 34.) Account holders were notified of this change

---

[2] Although IRS Form 5305-A contains seven articles with an open eighth article, the IRS Form 5305-R contains an additional article (Article II) which adds account contribution limits for a Roth and also limits some of the language found in form 5305-A Article IV(3). This results in IRS Form 5305-R containing eight articles with an additional open ninth article. Although there is a difference between a traditional and Roth IRA for tax purposes, the court will treat these accounts as the same for purposes of the present analysis.

by mail at the recorded address on each of their accounts. (Trial Ex. 32, 33.) As part of this process, New Direction updated their Custodial Agreement and Disclosure Statement for their accounts to reflect this change in account Custodian. (Trial Ex. 35, 36.) Prior to this time, none of the Custodial Agreement and Disclosure Statements contained any arbitration provision, but previous versions did include clause 8.05 (9.03 for the Roth IRA accounts) which states:

> **Amendment**: The Depositor irrevocably delegates to the Custodian the right and power to amend this Custodial Agreement. Except as hereafter provided, the Custodian will give the Depositor 30 days prior written notice of any amendment. In case of a retroactive amendment required by law, the Custodian will provide written notice to the Depositor of the amendment within 30 days after the amendment is made, or if later, by the time that notice of the amendment is required to be given under regulations or other guidance provided by the IRS. The Depositor shall be deemed to have consented to any such amendment unless the Depositor notifies the Custodian to the contrary within 30 days after notice to the Depositor and requests a distribution or transfer of the balance in the account.

(Trial Ex. 30, 31.) After the 2018 new amendments to the Custodial Agreement and Disclosure Statement documents, the foregoing amendment provision landed in sections 8.03 for the traditional accounts and 9.03 for the Roth accounts. (Trial Ex. 35, 36.)

On April 16, 2019, New Direction again gave notice to account holders that it was updating the Custodial Agreement and Disclosure Statement documents. Using batch email software, New Direction sent emails between April 16 and 17, 2019, to all account holders who had opted into electronic communications, and mailed hard copies of the notice to the addresses of account holders who did not opt into electronic communication. Although the new Custodial Agreement and Disclosure Statement documents involved several changes, the changes most relevant to Defendants' motions were amendments to articles 8.02-8.05 for the traditional IRA accounts and articles 9.02-9.05 for the Roth IRA accounts, which added an arbitration agreement. (Trial Ex. 38, 39.) The email giving notice of this change contained the subject line "New Direction Trust Company," and upon opening the email, the account holder would see a text box with an embedded

4

subject line reading "Important Update to your NDTCO Custodial Agreement."  (Trial Ex. 26.)

The text of the email was as follows:

> Dear [account holder],
> There has been an update to your custodial account agreement.  This is a notification of the change only; no additional action is needed from you at this time.
> To view the updated agreement, please visit our forms page [hyperlinked] or:
> 1. Visit NDTCA.com [hyperlinked] and select Fees & Forms from the top of the page.
> 2. Click the "Go To Forms" button.
> 3. Click "Account Disclosures" to expand the list.
> 4. Select the document that applies to your account type.
> If you have any questions, please contact client services. . .
> Best Regards,
> New Direction Trust Company

(*Id*.)  The court will hereinafter refer to this email as the April 2019 notice of amendment.  At the time this April 2019 notice of amendment went out, the forms page on the New Direction website contained a dead link for the new Custodial Agreement and Disclosure Statement documents; however, this was remedied by New Direction on the morning of April 17, 2019.

Plaintiffs in this matter are three individual account holders of self-directed IRAs that are administered by New Direction.  Plaintiff Dr. Gil Theriault is a family medicine physician from Vermont who has had numerous accounts with New Direction, but he opened the self-directed Roth IRA account most relevant to this matter in 2012.  (Trial Ex. 1-4.)  Plaintiff William Weigel opened his traditional self-directed IRA with New Direction in October 2016.  (Trial Ex. 12-14.)  At the time he opened his New Direction account, Mr. Weigel worked for a company called DST, which was a transfer agent company which stored documents and records for financial service providers.  However, he now co-owns Sun Burst Systems, a sign manufacturing and retail company, and lives in Olathe, Kansas.  Although both Dr. Theriault and Mr. Weigel admit to receiving their initial account documents, they both deny receiving or having any knowledge of

the April 2019 notice of amendment sent by New Direction.[3]  However, New Direction records indicate that the April 2019 notice of amendment was sent to each of the emails associated with the accounts for both Dr. Theriault and Mr. Weigel without any response from the email host servers that the notice had been rejected or returned as undeliverable.  (Trial Ex. 8, 17.)  Plaintiff Christy Wallace is a California resident who formerly worked in interior design and construction management and now practices energy medicine.  She opened her traditional self-directed IRA with New Direction in July 2016.  (Trial Ex. 20–25.)  She admits to receiving not only her initial account documents, but she also received and retained her copy of the April 2019 notice of amendment, which has been preserved in Trial Exhibit 26.

Each of these Plaintiffs chose to open a New Direction self-directed retirement account for the purpose of investing in gold and other precious metals.  As part of the account creation process, each Plaintiff submitted a Depository Election Form, directing that the precious metals purchased in each of their accounts were to be stored at First State Depository ("FSD") in Wilmington, DE, which was one of the institutions New Direction used to hold alternative assets such as precious metals.  (Trial Ex. 2, 14, 25.)  Each Plaintiff also submitted a Precious Metals Buy Direction Letter to New Direction and received confirmation that their purchase had been executed as they had directed.  (Trial Ex. 5, 6, 16, 24.)

The court finds all the above facts based upon the evidence presented at the summary trial. The following additional facts are now laid out from the two operative complaints and previous case records for purposes of background and procedural history.  In 2022, the Commodity Futures Trading Commission filed a lawsuit in the United States District Court for the District of Delaware

---

[3] Dr. Gil Theriault also contests that the April 2019 notice of amendment was sent to an email account he no longer accessed, and that New Direction should have been on notice of a new Gmail account since he used it with another account that has since been closed.  However, New Direction records show that he did not update his self-directed Roth IRA account contact to his new Gmail email until August 2022.  (Trial Ex. 9.)

6

against FSD and its owner, Robert Higgins, alleging that FSD and Higgins had stolen more than $110 million of the precious metals deposited in the financial institution. (*Theriault*, Doc. 1 at 1; *Wallace*, Doc. 1 at 1.) A large amount of the stolen assets included precious metals from self-directed IRA accounts, including the New Direction accounts of each of the Plaintiffs. (*Theriault*, Doc. 1 at 10-12; *Wallace*, Doc. 1 at 2.) Plaintiffs then filed two complaints alleging various counts of fraud, negligence, breach of fiduciary duties, and violations of state consumer protection laws, in addition to requesting dueling class certifications. (*Theriault*, Doc. 1; *Wallace*, Doc. 1.)

In response, Defendants filed motions to dismiss and compel arbitration that formed the basis for the summary trial. (*Theriault*, Docs. 16, 24; *Wallace*, Docs. 17, 18.) Defendants argued that the April 2019 amendments to the Custodial Agreement and Disclosure Statement documents constituted a binding arbitration agreement and that Plaintiffs consented to the unilateral amendment of the account documents by failing to object or otherwise close their accounts. However, in June 2024, New Direction again amended its Custodial Agreement and Disclosure Statement documents. In the 2024 notice of amendment email, New Direction included a fairly detailed summary of the contractual changes, including an arbitration agreement. (Trial Ex. 52QQ; *Theriault*, Doc. 45-1, 45-2, 45-3.) This presumptive amendment of the account documents led the undersigned to grant a temporary restraining order and preliminary injunction against Defendants, preventing them from enforcing these contractual changes against Plaintiffs and the putative class. (*Theriault*, Doc. 46, 48.) This injunction prompted Defendants to file a stipulation that the 2024 account changes did not prevent the claims in the complaints from being heard. (*Theriault*, Doc. 51.) Given that the two cases presented similar issues and identical Defendants, the court ordered a single summary trial on the issue of arbitrability and ordered that both cases would have coordinated hearings. (*Theriault*, Doc. 55; *Wallace*, Doc. 41.) As noted above, the court then held

7

the summary trial on arbitrability on March 4-5, 2025.

**II.     Standard**

When faced with a question on the validity an arbitration clause in a contract, a district court is tasked with determining "certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003). An arbitration agreement is fundamentally a matter of contract between the parties. *Bellman v. i3Carbon, LLC*, 563 Fed. Appx. 608, 612 (10th Cir. 2014) (quoting *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013)). Accordingly, the court must "apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (internal quotation marks omitted). A defendant bears the initial burden of showing that an arbitration agreement is valid and enforceable, but after this showing, the burden shifts to the plaintiff to demonstrate a genuine issue of material fact as to the making of the agreement to arbitrate. *SmartText Corp. v. Interland, Inc.*, 296 F. Supp. 2d 1257, 1263 (D. Kan. 2003). Where the parties dispute the existence of an arbitration agreement, the court "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012).

**III.    Analysis**

Under the terms of the self-directed IRA account Custodial Agreement and Disclosure Statement documents, the parties have agreed to be bound by the laws of the state in which the

account Custodian resides; namely, the state of Kansas.[4] Under Kansas law, the question whether the parties have created a binding contract is a question of fact and it depends on the parties' intent. *Reimer v. Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914, 916 (1998). "In determining intent to form a contract, the test is objective, rather than subjective, meaning that the relevant inquiry is the manifestation of a party's intention, rather than the actual or real intention." *O'Neill v. Herrington*, 49 Kan. App. 2d 896, 904, 317 P.3d 139, 145 (Kan. Ct. App. 2014) (citing *Southwest & Assocs., Inc. v. Steven Enters.*, 32 Kan. App. 2d 778, 781, 88 P.3d 1246 (Kan. Ct. App. 2004)). It is also true that in Kansas "the terms of a written contract may be varied, modified, waived, annulled or wholly set aside." *Fast v. Kahan*, 206 Kan. 682, 684, 481 P.2d 958, 961 (1971). However, "[o]ne party to a contract cannot unilaterally change the terms thereof. Modification requires the assent of all the parties to the contract . . . Mutual assent may not only be shown by an express agreement, but also may be implied from the circumstances and conduct of the parties." *Id*. An arbitration agreement is fundamentally a matter of contract, and the terms of the contract are to be enforced if they are clear. *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550, 553–54 (2007). Whether a particular term of a written contract has been modified or waived by a later agreement is a question of fact. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1209, 308 P.3d 1238, 1249 (2013). However, when the legally relevant facts of a contract's formation are decided or undisputed, the existence and terms of a contract are questions of law. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542, 546 (2012).

As a threshold matter, the court must determine whether Plaintiffs received the April 2019 notice of amendment regarding the updated Custodial Agreement and Disclosure Statement

---

[4] Both account custodians for the period relevant to this litigation (Mainstar Trust and New Direction Trust Company) reside in Kansas, and Custodial Agreement and Disclosure Statement documents after 2019 include a choice of law provision selecting Kansas. *See, e.g.*, Trial Ex. 38 at § 8.1, Trial Ex. 39 at § 9.1.

documents. Considering the testimony presented in the summary trial, Trial Exhibits 8, 17, 27, and 33 (which outlines New Direction's corporate record of the notice email being sent to all Plaintiffs in April 2019), and the text of the April 2019 notice of amendment preserved by Ms. Wallace in Trial Exhibit 26, the court finds that Defendants have created a presumption that each of the Plaintiffs were sent the April 2019 notice of amendment and each email server for each Plaintiff received that email. Although the court believes that Plaintiffs Dr. Theriault and Mr. Weigel no longer have records of this email, their testimony that they never received the notice email, while made in good faith, does not overcome the presumption of receipt. This conclusion is buttressed by the fact that Ms. Wallace preserved her copy of the email. In sum, New Direction's records clearly show that the April 2019 notice of amendment was sent to these Plaintiffs at their email address of record, and that no notice of undeliverability was received from the relevant email servers. Therefore, the court concludes it is more likely than not that Plaintiffs each received the April 2019 notice of amendment to the Custodial Agreement and Disclosure Statement documents.

However, the court's analysis does not end with merely factually determining that Plaintiffs received the April 2019 notice of amendment. Given that the 2019 amendments added an arbitration agreement to the account documents, the proponent of the arbitration clause bears the burden of showing that the clause is legally valid and enforceable.[5] *SmartText Corp.*, 296 F. Supp.

---

[5] Plaintiffs also argued vigorously in their briefs and at trial that they were never provided copies of the original Custodial Agreement and Disclosure Statement documents when they opened their accounts. (*Theriault*, Doc. 26 at 2-7, Doc. 37 at 4 n.2; *Wallace*, Doc. 22 at 4-10.) In essence, they argue that the adoption agreements and other paperwork presented to them when they opened their accounts did not include or adequately identify and incorporate these disputed documents. Accordingly, they argue that the Custodial Agreement and Disclosure Statement documents never became part of their agreements with New Direction, and that any amendments to those documents are likewise not binding on them. (*Theriault*, Doc. 26 at 2-7, Doc. 37 at 4 n.2; *Wallace*, Doc. 22 at 4-10.) New Direction counters that these documents were adequately identified and incorporated at the time of contract formation, relying heavily on *Rosemann v. Sigillito*, 877 F.Supp.2d 763 (E.D. Mo. 2012), for this conclusion. (*Theriault*, Doc. 35 at 2-3, 10; *Wallace*, Doc. 30 at 4, 10.) The court need not resolve this issue because of its determination that the April 2019 notice of amendment was ineffective. Accordingly, the court assumes, without deciding, that the original Custodial Agreement and Disclosure Statement was effectively incorporated by reference into the original agreements between Plaintiffs and Defendants, including its provisions regarding the process for amending those agreements.

2d at 1263. Whether a term of a written contract has been modified by a subsequent agreement is a question of fact and relies on whether the modification is conspicuous or known to both parties. *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 330, 582 P.2d 1111, 1120 (1978). "The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Knisley v. Equity Bank*, 553 P.3d 982 (Kan. Ct. App. 2024) (unpublished table decision) (citing Restatement (Second) of Contracts § 69, comment c). To show that a party intends to be bound to a contract modification, the offeror must show assent or "a meeting of the minds with respect to the proposed modification." *Fast*, 481 P.2d at 961. "The conduct manifesting such assent may be words or silence, action or inaction, but '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012) (citing Restatement (Second) of Contracts § 19(2)).

On this matter, the court finds the Kansas Court of Appeals case of *Duling v. Mid Am. Credit Union*, 63 Kan. App. 2d 428, 530 P.3d 737 (2022), to be informative. In this factually similar case, the court of appeals was faced with a question of whether Mid-American Credit Union's ("MACU") attempt to add an arbitration clause to an existing account membership agreement via an email notice was valid and enforceable. To prevent the contract from being illusory, the court of appeals held MACU had to provide reasonable notice of the changes it intended to make to the terms and also provide a clear means for the other party to reject the modification. *Duling*, 63 Kan. App. 2d at 439, 530 P.3d at 746. This was required to show assent, which is necessary for any contract modification in Kansas. However, MACU contended the plaintiff accepted its offer to amend the initial agreement by not electing to exercise her right to

opt out and by then continuing to use her account. *Duling*, 63 Kan. App. 2d at 441, 530 P.3d at 747. The court of appeals ruled that ambiguity in the notice regarding the time that the plaintiff had to opt out of the agreement was to be construed against MACU, and as a result, MACU "failed to show [the plaintiff] assented to its offer to add an arbitration clause to her membership agreement by her continued use of her account after receiving notice of the ambiguous opt-out date." *Duling*, 63 Kan. App. 2d at 446, 530 P.3d at 750.

In a similar way here, New Direction's April 2019 notice of amendment contains no information which would provide an account holder of ordinary sensibilities any information as to what changes were being made to their account or how to opt out of them. In fact, the text of the April 2019 notice of amendment goes so far as to say "[t]his is a notification of the change only; no additional action is needed from you at this time." (Trial Ex. 26.) Not only does this language fail to inform the recipient of any process to opt out of or reject the amendment, but it suggests that there is no action that an account holder even could take to opt out of the proposed changes. This lack of any relevant information as to the proposed changes or how to opt out fails to show a necessary meeting of the minds and makes the whole notice insufficient to create a valid contract modification.[6] *Fast*, 481 P.2d at 961.; *Duling*, 63 Kan. App. 2d at 446, 530 P.3d at 750. Indeed, with not even the slightest hint of the nature of the changes to the Custodial Agreement and Disclosure Statements, the recipients of the April 2019 notice of amendment were left to perform

---

[6] The court notes that in the motion to compel arbitration, Kevin Dodson (New Direction's agent) filed an initial affidavit stating that the subject line of the April 2019 notice of amendment included an express reference to arbitration. *Theriault*, Doc. 35-6 at 5; *Wallace*, Doc. 17-10 at 5 (attesting that the subject of the April 2019 notice was "Re: NOTICE OF CHANGE TO CUSTODIAL AGREEMENT (Arbitration)"). However, prior to the summary trial, Mr. Dodson recanted this statement by filing a supplemental declaration to correct this error and to reflect the correct title as seen in Trial Exhibit 26. *Theriault*, Doc. 96; *Wallace*, Doc. 52. The court need not take any position on the propriety of waiting to file this supplement until after a Rule 30(b)(6) deposition, but instead notes the fact that the word "arbitration" was not included in the subject of the April 2019 notice of amendment stands to reinforce this court's conclusion that an account holder of ordinary sensibilities would lack proper notice of New Direction's proposed April 2019 amendments.

a line-by-line or word-for-word comparison between the existing versions of the agreements and the proposed amended agreements to discover what changes they were being asked to implicitly accept. Moreover, the language of New Direction's April 2019 notice stands in clear factual distinction to other cases from this district finding the existence of a valid arbitration agreement where arbitration agreement notices sent to account holders explicitly state that arbitration is being added or an arbitration agreement is independently signed by the parties. *See, e.g.*, *Hancock*, 701 F.3d at 1259 (10th Cir. 2012) (holding an email notice of arbitration sent was sufficient when the first email bullet point states "Arbitration Agreement. We have added language that requires customer disputes . . . to be submitted to binding arbitration or small claims court"); *Bolden v. AT & T Servs., Inc.*, 350 F. Supp. 3d 1029, 1031 (D. Kan. 2018) (compelling arbitration where notice was given to the plaintiff and clearly titled with "Action Required: Notice Regarding Arbitration Agreement"); *Kerr v. Dillard Store Servs., Inc.*, No. CIV.A.07-2604-KHV, 2008 WL 2152046, at *3 (D. Kan. May 21, 2008) (ordering a trial to determine the existence of an arbitration agreement where "[t]he [arbitration] agreement appears to bear [the] plaintiff's electronic signature"). Therefore, New Direction has failed to meet its necessary burden of proving that the added arbitration agreement is valid and enforceable.

The conclusion that the April 2019 notice of amendment is threadbare and unable to provide proper notice of an amendment is reinforced by the later attempt by New Direction to amend their account documents in 2024. (Trial Ex. 52QQ; *Theriault*, Doc. 45-1, 45-2, 45-3.) This later 2024 amendment to New Direction account documents clearly lays out both the proposed changes (including arbitration) and the process by which account holders can opt out of the amendment. This 2024 notice of amendment would presumptively satisfy the notice requirement for contract modification under Kansas law since it provides account holders with both the full

13

knowledge of the proposed modifications and the procedure to opt out, which would therefore enable New Direction to interpret the continued use of an account as an assent to the amendment. Nevertheless, the fact that New Direction sent a proper notice in 2024 highlights the insufficiency of the April 2019 notice of amendment and rebuts the argument that the April 2019 notice of amendment contained sufficient information for an account holder of ordinary sensibilities to understand and assent to the modification of the terms of their account agreements.

New Direction's argument that the modified forms were available to read on the New Direction website, and therefore constitute notice of the arbitration amendment, is similarly unconvincing. The day that the April 2019 notice of amendment was sent to account holders, the New Direction website contained a dead link for the Custodial Agreement and Disclosure Statement documents. Although New Direction fixed the problem quickly, an account holder who immediately followed the links or the instructions as set out in the email would not have been able to access their relevant account documents. Additionally, even if an account holder did access their Custodial Agreement and Disclosure Statement documents, the addition of the arbitration clauses was inconspicuous upon initial review. These clauses were embedded in the middle of other boilerplate language so as to make it undiscernible to an account holder of ordinary sensibilities and potentially unconscionable under Kansas law. *See, e.g.*, *Wille v. Sw. Bell Tel. Co.*, 219 Kan. 755, 758–59, 549 P.2d 903, 906–07 (1976). Moreover, these arbitration provisions had never been included in prior versions of the account documents. Thus, under Kansas law, Defendants need to show that the account holders intended to accept or assent to the arbitration agreement through their silence, and Defendants have failed to meet that burden. *Knisley v. Equity Bank*, 553 P.3d 982 (Kan. Ct. App. 2024) (unpublished table decision) (citing Restatement (Second) of Contracts § 69).

Accordingly, the court denies Defendants' request for an order compelling arbitration and dismissing these cases. In light of the court's ruling, it need not address the other remaining issues argued in the motions at this time, such as whether the term "plan agreement and disclosures" in the New Direction account application includes the Custodial Agreement and Disclosure Statement documents by reference.

**IV.     Conclusion**

The motions to compel arbitration by Defendants New Direction IRA, Inc. and New Direction Trust Company (*Theriault*, Doc. 16; *Wallace*, Doc. 17) are DENIED. The motions to dismiss and compel arbitration by Defendant Mainstar Trust (*Theriault*, Doc. 24; *Wallace*, Doc. 18) are DENIED.

IT IS SO ORDERED. Dated this 31st day of March 2025.

_____s/ John Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE