# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOSEPH THERIAULT and WILLIAM WEIGEL, individually and on behalf of all those similarly situated, | ) ) ) ) | **CONSOLIDATED CASES** |
| *Plaintiffs*, | ) ) | Case No.: 2:23-cv-02477-JWB-ADM |
| v. | ) ) | |
| NEW DIRECTION IRA, INC., NEW DIRECTION TRUST COMPANY, and MAINSTAR TRUST, | ) ) ) ) | |
| *Defendants*. | ) ) | |
| CHRISTY WALLACE, on behalf of herself and all others similarly situated, | ) ) ) | |
| *Plaintiff*, | ) ) | Case No.: 2:24-cv-02007-JWB-ADM |
| v. | ) ) | |
| NEW DIRECTION IRA, INC., NEW DIRECTION TRUST COMPANY, and MAINSTAR TRUST, | ) ) ) ) | |
| *Defendants*. | ) ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................... 1

RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS ............................ 2

ARGUMENT ............................................................................................................................. 9

I.     The Plain Language of the Parties' Contracts Controls the Outcome. ............................. 9

     A.     There is Nothing Unconscionable About These Exculpatory Provisions............ 10

     B.     There is No Fraud. ............................................................................................ 11

     C.     The Exculpatory Language Covers the Plaintiffs' Claims. .................................. 14

II.     The Parties Specifically Agreed That the Plaintiffs Would Undertake Their Own Due Diligence and Investigation Regarding All Investment Decisions. ......................... 18

CONCLUSION........................................................................................................................ 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott v. Chemical Trust*,
  Case No. 01-2049-JWL, 2001 U.S. Dist. LEXIS 6214 (D. Kan. Apr. 26, 2001)............ *passim*

*Brock v. Roberts Realty, Inc.*,
  Op. No. 68,771, 1993 Kan. App. Unpub. LEXIS 204 (Kan. Ct. App. 1993).........................19

*Brown v. Cal. Pension Adm'rs & Consultants*,
  45 Cal. App. 4th 333 (Cal. Ct. App. 1996) .............................................................................11

*CFTC v. First State Depository Co., LLC*,
  Case No. 1:22-cv01266-RGA (D. Del.)......................................................................................3

*Cowburn v. Leventis*,
  619 S.E.2d 437 (S.C. Ct. App. 2005)..................................................................................16, 17

*Edwards v. Phillips Petroleum Co.*,
  360 P.2d 23 (Kan. 1961) ........................................................................................................19

*Freedom Transp. v. Navistar Int'l Corp.*,
  Case No. 2:18-cv-02602-JAR-KGG, 2020 U.S. Dist. LEXIS 13579 (D. Kan.
  Jan. 28, 2020)........................................................................................................................17

*Grant v. Pensco Trust Co.*,
  Case No. 12-cv-06084-WHO, 2013 U.S. Dist. LEXIS 125649 (N.D. Cal. Sept.
  3, 2013) ................................................................................................................................13

*Holland Furnace Co. v. Williams*,
  295 P.2d 672 (Kan. 1956) ......................................................................................................19

*Levine v. Entrust Group, Inc.*,
  Case No. C 12-03959 WHA, 2013 U.S. Dist. LEXIS 47132 (N.D. Cal. Apr. 1,
  2013) ....................................................................................................................................11

*Metz v. Ind. Trust Corp.*,
  994 F.2d 395 (7th Cir. 1993) ...............................................................................................16, 17

*Saleh v. Merchant*,
  Case No. 14-CV-09186, 2023 U.S. Dist. LEXIS 55653 (N.D. Ill. Mar. 30,
  2023) ....................................................................................................................................19

*Scionti v. First Trust Corp.*,
  Case No. H-95-5493, 1999 U.S. Dist. LEXIS 23253 (S.D. Tex. June 24, 1999)..........8, 16, 17

*Tucker v. Soy Capital Bank & Trust Co.*,
   974 N.E.2d 820 (Ill. App. Ct. 2012) ...............................................................................16, 17

**Rules and Regulations**

26 Code of Federal Regulations § 1.408-2(e)(5)(v)(B) ...............................................................4, 5

Federal Rules of Civil Procedure Rule 56(d)..................................................................................5

Local Rule 56.1(c) ...........................................................................................................................2

## <u>INTRODUCTION</u>

The issues presented in this case have been addressed time and again by courts around the country, and always with the same answer: no matter how outlandish the allegations or how sympathetic the plaintiffs, defendants in the shoes of the New Direction entities and Mainstar Trust are not liable for losses that an investor suffers in a self-directed account. That is the very nature of self-directed accounts: the accountholder undertakes all due diligence for him- or herself, and he or she alone bears all responsibility for the risks and outcomes associated with the account. Courts nationally have repeatedly affirmed this straightforward outcome.

Through this litigation, the Plaintiffs are asking the Court to excuse the accountability that lands exclusively on investors in self-directed accounts. The Plaintiffs' opposition briefs spin an extreme story and try to overwhelm the Court with speculation, hunches, and paperwork, all to create the misimpression that the Court is helpless to resolve this case unless and until the parties have burned untold resources chasing every conceivable theory the Plaintiffs may have regarding First State Depository, Robert Higgins, the three Defendants, and who knows who else.

The case is far simpler than that. Nothing can change the plain language of the key account documents that each Plaintiff executed and about which each Plaintiff has already testified on the witness stand, under oath, and in-person with the Court. This is precisely why the Defendants moved for summary judgment promptly after each Plaintiff confirmed the legitimacy of these key documents while testifying in open court, and it is why the Defendants have resisted wasting scarce resources on discovery that cannot possibly impact the controlling legal analysis. Respectfully, the Court should enforce the parties' agreements precisely as they are written and grant summary judgment on all claims.

## <u>RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS</u>

Pursuant to D. Kan. Rule 56.1(c), the New Direction entities respond to the Plaintiffs' Statement of Additional Material Facts below. But the Court should not be misled—none of the "additional facts" contained in the Plaintiffs' opposition brief are "material" to the dispositive issues, and New Direction does not intend for its responses to be misunderstood as suggesting that the Plaintiffs' "additional facts" are relevant to the motion:[1]

1.      This is a statement of Plaintiffs' counsel, not a statement of fact. There is no additional discovery that can change the plain language of the parties' contracts, which are controlling and dispositive. But the New Direction entities certainly dispute the mischaracterization of their litigation posture as "stonewalling" anything; the parties have already conducted discovery on the facts that are material to this motion, thus making this motion ripe.

2.      This is also a statement of counsel, not a statement of fact. As above, the material facts are contained within the four corners of the parties' agreements, and no amount of discovery will change those documents.

3.      This is also a statement of counsel, not a statement of fact, and does nothing to alter the plain language of the parties' contracts.

4.      As presented in the Plaintiffs' brief, this "additional fact" contradicts the Plaintiffs' own declarations. The Plaintiffs' actual declarations do not indicate that New Direction in any way "limited Plaintiffs' options for selection of depositories." (ECF Nos. 161-3 (Decl. Theriault), 161-4 (Decl. Weigel), and 161-5 (Decl. Wallace).) The remainder of this "additional fact" suggests the Defendants had some undefined disclosure obligation, which is wrong as a matter of law.

---

[1]    Unless otherwise noted, all citations to the filings in these cases are to the Docket Entries for the *Theriault/Weigel* matter, Case No. 2:23-cv-02477-JWB-ADM.

5.      As presented in the brief, this "additional fact" contradicts the Plaintiffs' own declarations. The named Plaintiffs' sworn statements do not indicate that any New Direction entity said anything to these Plaintiffs about First State Depository's insurance. (*Id.*)

6.      This is not a statement of fact, but instead is speculation about what the Plaintiffs claim they may have done if they had learned additional information about First State Depository prior to selecting it as the vault to store their precious metals. Critically, though, each Plaintiff confirmed their "understand[ing] that neither the Administrator nor the Custodian has reviewed or will review the merits, legitimacy, appropriateness or suitability of this investment, and I certify that ***I have done my own due diligence investigation*** prior to instructing the Administrator to execute this transaction for my account." (Trial Exhibits 5, 16, 24 (Precious Metals Buy Direction Letters for each Plaintiff) (emphasis added).)

7.      This statement is confusing. Given the Plaintiffs' imprecise use of the pronoun "it" in the statement, the New Direction entities do not entirely understand what the Plaintiffs are alleging. For purposes of this reply, New Direction states that in 2022, a federal court appointed a receiver over First State Depository in *CFTC v. First State Depository Co., LLC*, Case No. 1:22-cv01266-RGA (D. Del.), and the receiver was still doing his investigation into First State Depository at year end 2022.

8.      This statement is incorrect and is directly rebutted by the Plaintiffs' own Exhibit 1-F. (ECF No. 161-2, at ECF p. 127.) That exhibit is a 2009 public announcement through which First State Depository notified the world that it would store precious metals for accountholders who have self-directed IRAs at New Direction. (Attachment A, Timeline of Key Events.)

The Plaintiffs' Exhibit 1-F is especially notable because the primary theme of the Plaintiffs' opposition is that they never would have decided to store precious metals at First State Depository

if they had known about any "relationship" between New Direction and First State Depository. This announcement makes it ***indisputable*** that First State Depository's willingness to hold precious metals for New Direction accountholders was a publicly-known fact as early as 2009—three years before Dr. Theriault opened his self-directed IRA, and seven years before Mr. Weigel and Ms. Wallace opened theirs. That the Plaintiffs apparently did not read this public announcement when conducting their own due diligence does not somehow excuse their contractual obligations to perform their "own due diligence investigation prior to instructing the Administrator to execute this transaction for my account" or otherwise render the Defendants liable for a fraud perpetrated by First State Depository. (Trial Exhibits 5, 16, 24 (Precious Metals Buy Direction Letters for each Plaintiff).)

9.     This statement is likewise directly rebutted by the Plaintiffs' own Exhibit 1-F.

10.     This statement is likewise directly rebutted by the Plaintiffs' own Exhibit 1-F.

11.     This statement is irrelevant to the plain language of the parties' contracts that control this case. Nevertheless, New Direction agrees that some of its personnel visited the First State Depository, and that they too were defrauded by Mr. Higgins regarding what precious metals were within the physical custody of First State Depository.

12.     This statement has nothing to do with these Plaintiffs, as none of these Plaintiffs purchased precious metals in the so-called "Silver Lease Program."

13.     New Direction has no idea if First State Depository "gave kickbacks" to anyone; it only knows that it received no such "kickbacks." But more importantly, that has nothing to do with the plain language of the parties' contracts that control this case.

14.     This is a proposed statement of law, not of fact, and it is both irrelevant and incorrect. 26 C.F.R. § 1.408-2(e)(5)(v)(B) is the regulation that addresses storage of physical assets

in custodial accounts. It provides: "Assets of accounts requiring safekeeping will be deposited in an adequate vault. A permanent record will be kept of assets deposited in or withdrawn from the vault" *Id.* There is an entire industry that provides such "vault" services, and the Plaintiffs selected First State Depository as the vault for their self-directed accounts.

15.    This contains an erroneous legal statement in which the Plaintiffs attempt to assign to Mainstar Trust and New Direction Trust "a duty to maintain physical custody over the precious metals in their custody." That is incorrect; the Plaintiffs themselves assigned that duty to First State Depository when they signed contracts directly with First State Depository to store their precious metals. (Trial Exhibits 2, 14, 25 (First State Depository Election Forms for each Plaintiff).)

The Plaintiffs appear to fundamentally misunderstand that they, not New Direction or Mainstar, contracted with First State Depository for these vault services. Each Plaintiff notified the New Direction entities and Mainstar of their vault selection by transmitting executed copies of First State Depository's "Depository Election Form" so that the trust companies could satisfy their above-stated regulatory responsibilities. (*Id.*) That form indicated that there was an additional "Depository Custody Agreement" governing each Plaintiff's relationship with First State Depository, and it explained that agreement is "available upon request from First State Depository." (*Id.*)

Yet, throughout their filings, the Plaintiffs argue that the Court cannot grant summary judgment because the Plaintiffs do not have a copy of the "Depository Custody Agreement." (*E.g.*, ECF No. 161, at 10, 11, 24, 29 n.5 (brief); ECF No. 161-2, ¶ 63 (Rule 56(d) affidavit).) Simply put, a contract **between the Plaintiffs and First State Depository** has nothing to do with the Defendants' arguments here, and the fact the Plaintiffs never requested that document from First State Depository obviously is no impediment to resolving this case with respect to the Defendants.

16.    This statement is irrelevant to this case.

17.    This statement is irrelevant to this case.

*Theriault/Weigel* Paragraphs 18 through 22. These statements appear to repeat the same "additional facts" that were addressed above in Paragraphs 4, 5, 6, 8, 9, and 10, but with respect to Dr. Theriault. As such, the New Direction entities incorporate their responses above.

Moreover, these paragraphs speculate that Dr. Theriault "would have been suspicious of FSD" if the Defendants had disclosed unspecified "bad acts" by Mr. Higgins and that New Direction had put First State Depository on its internal "administratively infeasible" list. These statements are misleading.

New Direction does not know to what "bad acts" the Plaintiffs are referring but assumes this refers to the fraud for which Mr. Higgins was recently convicted and is now in jail. First State Depository did not get placed on New Direction's "administratively infeasible" list until it learned about Mr. Higgins's fraud through the government's criminal investigation of him in 2021. Both of these "undisclosed" events took place nearly a decade after 2012, when Dr. Theriault opened his self-directed IRA and selected First State Depository as his vault. *That is undisputed*.

*Theriault/Weigel* Paragraphs 23 through 34. These statements appear to repeat the same "additional facts" that were addressed above in Paragraphs 4, 5, 6, 8, 9, and 10, but with respect to Mr. Weigel. As such, the New Direction entities respectfully incorporate their responses above.

As with Dr. Theriault, these paragraphs discuss the alleged nondisclosure of unidentified "bad acts" by Mr. Higgins (though they add a note about a 2013 lawsuit, which would obviously be a public record discoverable by Mr. Weigel and anyone else) and New Direction's eventual placement of First State Depository on its internal "administratively infeasible" list. And as before, these statements are misleading.

Just as with Dr. Theriault, New Direction does not know to what "bad acts" the Plaintiffs are referring but again assumes this refers to the fraud for which Mr. Higgins was recently convicted and is now in jail. First State Depository did not get placed on New Direction's "administratively infeasible" list until it learned about Mr. Higgins's fraud through the government's criminal investigation of him in 2021. Both of these "undisclosed" events took place several years after 2016, when Mr. Weigel opened his self-directed IRA and selected First State Depository as his vault. (Attachment A, Timeline.) *That is undisputed*.

Finally, as the Court saw through Exhibit 15 at trial, New Direction identified a depository other than First State Depository for Mr. Weigel's awareness as he researched vaults in which he could store his precious metals. *That is undisputed.*

_Wallace_ Paragraphs 18 through 26. These statements appear to repeat the same "additional facts" that were addressed above in Paragraphs 4, 5, 6, 8, 9, and 10, but with respect to Ms. Wallace. As such, the New Direction entities respectfully incorporate their responses above.

These paragraphs again discuss the alleged nondisclosure of unidentified "bad acts" by Mr. Higgins and New Direction's placement of First State Depository on its internal "administratively infeasible" list. And as before, these statements are misleading.

As with the other two Plaintiffs, New Direction does not know to what "bad acts" the Plaintiffs are referring but again assumes this refers to the fraud for which Mr. Higgins was recently convicted and is now in jail. First State Depository did not get placed on New Direction's "administratively infeasible" list until it learned about Mr. Higgins's fraud through the government's criminal investigation of him in 2021. Both of these "undisclosed" events took place several years after 2016, when Ms. Wallace opened her self-directed IRA and selected First State Depository as her vault. (Attachment A, Timeline.) *That is undisputed*.

7

Finally, as the Court saw through Exhibit 20 at trial, New Direction identified multiple depositories other than First State Depository for Ms. Wallace's awareness as she researched vaults in which she could store her precious metals. That correspondence even stated: "New Direction doesn't limit your choice of depositories, though some precious metals dealers may have already established relationships with certain depositories and will recommend one to you." (Trial Exhibit 20, Email Correspondence to Ms. Wallace at PLFS 159.) ***That is undisputed.***

\* \* \* \* \*

A consistent theme emerges from the Plaintiffs' opposition briefs, pleas for more and more discovery, and several-hundred-page filings: they want the Court to focus on everything except the parties' unambiguous contract materials. And that's because the plain language of those documents reveal that the Plaintiffs alone must bear the consequences of their decisions.

The Plaintiffs' opposition arguments are no different than those presented by accountholders nationally who have sued passive custodians and administrators just like these Defendants when a self-directed investment decision turns out to have been fraudulent. As one court put it, an accountholder attempting to shift responsibility for his investment decision to the custodian "is like a painter with a box of water colors: he is attempting to obfuscate the separate activities and roles of the defendants and to smear their differing colors together with a broad brush stroke alleging fraud and conspiracy." *Scionti v. First Trust Corp.*, Case No. H-95-5493, 1999 U.S. Dist. LEXIS 23253, at \*126 (S.D. Tex. June 24, 1999).

At bottom, the division of responsibility and allocation of risks between the Plaintiffs, on the one hand, and the Defendants, on the other, are specifically defined by the parties' contract materials, and they are clear. Nothing in the Plaintiffs' requested additional discovery or in their counterstatement of "additional facts" undercuts that division, and summary judgment is proper.

## ARGUMENT

**I.     The Plain Language of the Parties' Contracts Controls the Outcome.**

The parties' contracts—namely, the Account Application (Trial Exhibits 1, 12, and 21) and the Buy Direction Letter (Trial Exhibits 5, 16, and 24), which all Plaintiffs concede they executed—do at least three things that resolve this case:

They fully disclaim any reliance on the Defendants for any aspect of the Plaintiffs' investment decisions or transaction. (*See, e.g.*, Account Application ("I understand that my account is *self-directed*, and *I take complete responsibility* for any investments I choose for my account."; Buy Direction Letter ("I understand that neither the Administrator nor the Custodian has reviewed or will review the merits, legitimacy, appropriateness or suitability of this investment, and *I certify that I have done my own due diligence investigation* prior to instructing the Administrator to execute this transaction for my account.") (emphasis added).)

They memorialize the Plaintiffs' agreement that the Defendants "*cannot be held responsible* for the actions of these [third-party] depositories," while also acknowledging that there are "numerous depositories" at which the Plaintiffs can choose to store their precious metals. (Buy Direction Letter (emphasis added).)

And they fully release the Defendants for liability related to "any loss to my account." (*See, e.g.*, Account Application ("I agree that the Custodian and the Administrator have no duty other than to follow my written instructions and will be under no duty to question my instructions and *will not be liable* for any investment losses sustained by me or my account under any circumstances." and "I acknowledge that the Custodian and Administrator *do not* provide or *assume responsibility* for any tax, legal, or investment advice with respect to the investments and assets in my account, and *will not be held liable* for any loss which results from my exercise of control over my account.") (emphasis added); Buy Direction Letter ("I acknowledge that *neither*

the Administrator nor the Custodian has provided or *assumed responsibility* for any tax, legal or investment advice with respect to this investment, and I agree that they *will not be liable* for any loss which results from my decision to purchase this investment." and "I agree that the Administrator and the Custodian *will not be liable* for any investment losses sustained by me or my account as a result of this transaction. I agree to indemnify and *hold harmless* the Administrator and the Custodian from any and all claims, damages, liability, actions, costs, expenses (including reasonable attorneys' fees) and any loss to my account as a result of any action taken in connection with this investment transaction or resulting from serving as the Administrator or the Custodian for this investment, including, without limitation, claims, damages, liability, actions and losses asserted by me.") (emphasis added).)

The Plaintiffs try to avoid the straightforward application of these sweeping provisions by arguing that they are "unenforceable due to unconscionability and fraud," and that they are "inapplicable to Plaintiffs' claims." (ECF No. 161, at 27–34.) These arguments uniformly fail.

### A.    There is Nothing Unconscionable About These Exculpatory Provisions.

The Plaintiffs' lead opposition argument is to suggest that the above-recited provisions are "unconscionable" because they are "technical in nature and difficult for a lay person to fully understand." (*Id.* at 27.) This is not credible, and the fact that the Plaintiffs lead with it exposes the futility of the Plaintiffs' entire case.

The language is not confusing or vague in any way: "I take complete responsibility," "I have done my own due diligence," the Defendants "cannot be held responsible for the actions of these depositories," and the Defendants "will not be liable for any loss" are all straightforward provisions that are fully consistent with the entire concept of a self-directed account.

Nor are these provisions buried within a mountain of legalese. For each Plaintiff, the Account Application and Buy Direction Letter combined are fewer than 10 pages—and the

exculpatory provisions recited above (and in the Defendants' opening memorandum) are pervasive through both documents. There is simply no room for confusion as to who bears responsibility for all decisions in a self-directed IRA: the accountholder, and the Defendants repeat this over and over throughout their documents specifically so that there can be no confusion. *See, e.g.*, *Brown v. Cal. Pension Adm'rs & Consultants*, 45 Cal. App. 4th 333, 343 (Cal. Ct. App. 1996) ("The documents repeatedly advised that appellants were to make their own investment choices, and that respondents would carry out direct written investment instructions and account for appellants' funds in their possession, but undertook no responsibility for the soundness of the investment choice or the performance of the investment. ***It is difficult to imagine language that would more clearly limit a contracting party's duty to another.***") (emphasis added).

It is in no way "unconscionable" to hold accountholders to the consequences of their decisions. Courts nationally do exactly that in this specific context—including this Court in *Abbott v. Chemical Trust*, Case No. 01-2049-JWL, 2001 U.S. Dist. LEXIS 6214 (D. Kan. Apr. 26, 2001). Likewise, the SEC has been warning investors since at least 2011 that they bear the responsibility for activity in a self-directed account. *See, e.g.*, *Levine v. Entrust Group, Inc.*, Case No. C 12-03959 WHA, 2013 U.S. Dist. LEXIS 47132, at *14 (N.D. Cal. Apr. 1, 2013) (citing the SEC's "Investor Alert" from September 2011 regarding self-directed accounts and concluding that in light of the SEC's statements, "it is not plausible that plaintiffs as a general matter would rely on defendants to seek out fraud" in their self-directed accounts), The Court should reject the Plaintiffs' "unconscionability" argument accordingly.

### B.    There is No Fraud.

The Plaintiffs next argue that the contracts should not be enforced as they are written because they were the product of fraud. (ECF No. 161, at 27–28.) But nowhere in their voluminous filing do the Plaintiffs identify a single false statement of then-existing fact by any of the

Defendants regarding First State Depository at the time the Plaintiffs executed the contract documents that they are now trying to avoid. Without any false statements, there can be no fraud.

Left without any false statements, the Plaintiffs shift to arguing the Defendants made misleading "omissions" by not publicizing a relationship between First State Depository and New Direction. (*Id.*) This fails on both the undisputed facts and settled law.

As discussed above—and as revealed by the Plaintiffs' own Exhibit 1-F (ECF No. 161-2, at ECF p. 127)—First State Depository publicly announced that it was storing precious metals for some New Direction accountholders as far back as 2009. Not only was the information on which the Plaintiffs base their "omission" argument never concealed from the Plaintiffs, it was broadcast to the public several years before the Plaintiffs opened their accounts with the Defendants.

Moreover, the Defendants did not have any duty to "speak" about ***any*** issues related to the Plaintiffs' due diligence into First State Depository or anything else associated with their investment decisions—that is the nature of a self-directed IRA. In *Abbott*, self-directed accountholders made the same "fraud by omission" arguments that these Plaintiffs assert. The Court recounted those alleged omissions:

> In support of their fraud claim, plaintiffs allege that FNB failed to disclose the existence of the grand jury subpoena; failed to disclose the phone call from Charles Kilway concerning the state investigation of Chemical Trust; failed to disclose that the Oklahoma Securities Commission was investigating Chemical Trust; misrepresented to plaintiffs that it had reviewed the Chemical Trust asset; misrepresented to plaintiffs the value of the Chemical Trust asset each month; and misrepresented the true reason that it resigned as custodian of plaintiffs' accounts.

2001 U.S. Dist. LEXIS 6214, at *32–33. Despite this extensive list, the Court granted summary judgment in the custodian's favor, holding that it had no duty to communicate any of the information on which those plaintiffs based their claims. *Id.* at *39.

*Abbott*'s rejection of a "duty to speak" controls here. These Plaintiffs specifically acknowledged in their Account Applications that "nothing will be construed as conferring

fiduciary status or responsibility on the Custodian or the Administrator." (Trial Exhibits 1, 12, and 21.) Without a special relationship, there can be no "duty to speak," which voids the Plaintiffs' "omission" arguments. *Abbott*, 2001 U.S. Dist. LEXIS 6214, at *34–39.

Lastly, in their individual declarations, the Plaintiffs generically allege that the Defendants should have informed the Plaintiffs about unspecified "bad acts" by Mr. Higgins—presumably, his fraudulent theft of metals, for which he is now serving time in prison—and New Direction's subsequent decision to deem First State Depository "administratively infeasible." (ECF Nos. 161-3, 161-4, 161-5 (declarations from each Plaintiff).)

Not only is there no duty to speak, these events on which the Plaintiffs rely all occurred several years *after* the Plaintiffs opened their self-directed accounts and chose to store their metals at First State Depository; they are, therefore, irrelevant to the analysis. *See, e.g.*, *Grant v. Pensco Trust Co.*, Case No. 12-cv-06084-WHO, 2013 U.S. Dist. LEXIS 125649, at *8–9 (N.D. Cal. Sept. 3, 2013) (granting motion to dismiss claims of fraud, conspiracy, negligent misrepresentation, and other causes of action in part because the self-directed plaintiff's "fraud allegations are based solely on Pensco's conduct *after* Grant made his investments in Gibraltar") (emphasis in original).

\* \* \* \* \*

The Plaintiffs' briefs strain to have the Court believe there must be some notion of fraud that will allow them to circumvent the plain language of the contracts into which they freely entered, which unambiguously outline the parties' respective responsibilities, and which conclusively quash their claims. But there isn't. A careful review of the actual evidence underlying the Plaintiffs' arguments reveals that there are no allegations that any Defendant made a false statement of a then-existing fact when the Plaintiffs opened their self-directed IRAs and chose to store their precious metals at First State Depository. And the only information to which the

Plaintiffs point in support of their "fraud by omission" theory was published online years before they opened their accounts and was fully knowable to them and the rest of the world. Despite the Plaintiffs' heated rhetoric, their "fraud" arguments fail, and the parties' contracts control.

### C.    The Exculpatory Language Covers the Plaintiffs' Claims.

Left without any legal defense to the exculpatory provisions, the Plaintiffs pivot and argue these myriad provisions are somehow inapplicable because they apply only to "investment losses." (ECF No. 161, at 30–34.) This position fails for at least three reasons.

First, the Plaintiffs' argument ignores the actual words in the contracts. On their face, these exculpatory provisions are not limited only to "investment losses," but specifically relieve the Defendants of *any* potential liability for following the Plaintiffs' directions.

The Account Application specifies the Defendants "will not be liable for *any loss* which results from my exercise of control over my account." (Trial Exhibits 1, 12, and 21 (emphasis added).) In the Buy Direction Letter, the Plaintiffs agreed "to indemnify and hold harmless the Administrator and Custodian from *any and all claims, damages, liability, actions, costs, expenses (including reasonable attorneys' fees) and any loss to my account* as a result of any action taken in connection with this investment transaction or resulting from serving as the Administrator or the Custodian for this investment, *including, without limitation, claims, damages, liability, actions and losses asserted by me*." (Trial Exhibits 5, 16, and 24 (emphasis added).)

Because the Plaintiffs released the Defendants from "any loss" and "any and all claims, damages, liability, actions, costs, expenses (including reasonable attorneys' fees) and any loss to my account" that result from the Defendants following the Plaintiffs' instructions, their argument that the exculpatory provisions only apply to losses resulting from underperforming investments fails. The Plaintiffs' proposed reading would also make no sense in this context, as the Defendants are passive and play no role in the investment-selection process in the first place.

Second, the Plaintiffs' argument would fail even if the Court were to give the parties' contracts the tortured reading proposed by the Plaintiffs, as the Plaintiffs' own pleadings entirely void their argument. While the Plaintiffs argue on the first page of their opposition memorandum that their case does not involve "investment losses" (ECF No. 161, at 1), their Complaints say precisely the opposite.

Under the heading "Net Losses to Date," Dr. Theriault and Mr. Weigel allege as follows:

> 151.    Despite the Receiver's efforts, Plaintiffs continue to be out the lion's share of their original investments, as well as the additional value they should have realized on those investments.
>
> 152.    At this juncture, Plaintiff Theriault has been able to transfer out from the Receiver roughly a third of the cash value of his original investment, and the Receiver has recorded Plaintiff Weigel's net loss at $63,200.

(*Theirault/Weigel* Compl. ¶¶ 151–523 (ECF No. 1).) Ms. Wallace similarly describes her damages as losses within her self-directed account:

> 54.    Plaintiff was only able to recover a small fraction of the assets in her New Direction SDIRA. Plaintiff recovered approximately $14,000 and the Receiver estimated the value of her stolen precious metals at $230,900.00.

(*Wallace* Compl. ¶ 54 (ECF No. 1 in Case No. 2:24-cv-02007-JWB-ADM).)

As the Court knows, this case is about the Plaintiffs attempting to recover their lost investments from the Defendants, which were the result of fraudulent behavior by a now-jailed third party. It defies all logic—and their own pleadings—for the Plaintiffs to argue that this case does not involve "investment losses."

Nor is the Plaintiffs' argument supported by law. Courts nationally have enforced such exculpatory provisions when, as here, a third party has stolen the entirety of assets within a self-directed IRA. *See, e.g.*, *Metz v. Ind. Trust Corp.*, 994 F.2d 395, 398–403 (7th Cir. 1993) (affirming summary judgment in favor of the custodian because of a series of "disclaimers, hold harmless provisions, and full acceptance of liability and responsibility by Metz" that is no different in kind from those present here, and concluding that the accountholder's "complaint falls on deaf ears" because of those exculpatory provisions); *Abbott*, 2001 U.S. Dist. LEXIS 6214, at \*38 ("The custodial agreement between the parties clearly states that FNB has 'no responsibility or involvement in evaluating or selecting any assets for disposition, and shall have no liability for any loss or damages that may result from or be associated with any requested investment transaction.'"); *Scionti*, 1999 U.S. Dist. LEXIS 23253, at \*113–14 (holding that exculpatory provisions blocked the investor's claims to recoup losses from the custodian through fraud, negligence, and statutory theories); *Tucker v. Soy Capital Bank & Trust Co.*, 974 N.E.2d 820, 829–30 (Ill. App. Ct. 2012) (affirming dismissal of claims because the custodial agreement released the custodian "from any potential claims for losses of investment in the IRAs" and "from any losses due to their [the accountholders'] investment direction"); *Cowburn v. Leventis*, 619 S.E.2d 437, 450 (S.C. Ct. App. 2005) (affirming summary judgment to the custodian of the plaintiff's self-directed IRA because the parties' contract made clear that the custodian was not responsible investment decisions or for losses in the self-directed account).

The Plaintiffs' attempts to distinguish this crush of case law fail. The Plaintiffs state in their opposition brief that these cases involved claims for "damages caused by a loss of value of the underlying investment." (ECF No. 161, at 33.) This is simply untrue. Instead, each involves assets in self-directed accounts being stolen by a fraudster, just as here.

*Metz* involved outright theft of the principal amount of a promissory note—"Intrust released the funds to Serfling who absconded with it and remains at large." 994 F.2d at 397.

*Abbott* involved a Ponzi scheme, where the custodian described the fraudulent investment as "Asset OK" during a preliminary review for administrative feasibility. 2001 U.S. Dist. LEXIS 6214, at *13–23.

*Scionti* involved falsifying real estate records. 1999 U.S. Dist. LEXIS 23253, at *19–20.

*Tucker* involved a Ponzi scheme, where the fraudster "directed all potential investors in Hubadex to contact Soy as the only bank they could use to invest with Hubadex." 974 N.E.2d at 824.

*Cowburn* involved a Ponzi scheme, where an employee of the custodian allegedly told the plaintiff-accountholder "I've been here two years, and these guys have never missed a payment, and they're always on time, and it seems good to me" when he inquired about the investment opportunity. 619 S.E.2d at 450.[2]

In each case, the court either granted summary judgment or dismissal in favor of the defendants because the parties' contract language relieved the defendants of any potential liability

---

[2]    The alleged statements in *Cowburn* are noteworthy, as they are on par with the Plaintiffs' assertions that New Direction personnel generically described First State Depository as being "reputable" and "suitable" several years before Mr. Higgins's fraud was uncovered. (*E.g.*, ECF No. 161, at 15, 16.) These kinds of generalized opinions are not actionable as a matter of law, and the Court should not credit the Plaintiffs' attempt to blur the record. *See, e.g.*, *Freedom Transp. v. Navistar Int'l Corp.*, Case No. 2:18-cv-02602-JAR-KGG, 2020 U.S. Dist. LEXIS 13579, at *22–24 (D. Kan. Jan. 28, 2020) (dismissing claims of fraudulent inducement arising from the sale of a fleet of vehicles that was based on statements that the trucks would be a "worthwhile purchase," the fleet "should be good trucks for you guys," "a lot of people use them here around town," and "we're number one for medium duty trucks," as such statements are not actionable because they are opinion, not false statements of then-existing facts).

associated with the self-directed accountholders' decisions. That is an essential element of self-directed accounts: all responsibility lies with the accountholders themselves. The Plaintiffs' efforts to evade that responsibility through this litigation should fail.

## II.    The Parties Specifically Agreed That the Plaintiffs Would Undertake Their Own Due Diligence and Investigation Regarding All Investment Decisions.

The Plaintiffs attempt to rehabilitate their fraud and misrepresentation claims by arguing that whether they reasonably relied on anything from any of the Defendants can only be a question of fact. (ECF No. 161, at 37–39.) But this is not correct.

The parties' contracts address with precision how much reliance the Plaintiffs agreed to place on anything they allegedly learned from any of the Defendants: zero. This is not a subtle part of the parties' relationship; it goes to the essence of a self-directed account.

In the Account Applications, each Plaintiff acknowledged that the Defendants provided no "tax, legal, or investment advice with respect to the investments and assets in my account," and each Plaintiff took "complete responsibility for any investment I choose for my account." (Trial Exhibits 1, 12, and 21.)

And in the Buy Direction Letters, each Plaintiff specifically "acknowledge[d] that neither the Administrator nor the Custodian has provided or assumed any responsibility for any tax, legal or investment advance with respect to this investment"; they specifically agreed the Defendants "cannot be held responsible for the actions of these [third-party] depositories"; and they specifically certified "that I have done my own due diligence investigation prior to instructing the Administrator to execute this transaction for my account." (Trial Exhibits 5, 16, and 24.)

These are not boilerplate provisions; instead, they memorialize in detail the Plaintiffs disclaiming reliance on the Defendants for any and all aspects of the Plaintiffs' transaction—again, the very nature of a self-directed account. Because the Plaintiffs agreed at every turn that they were

not relying on anyone but themselves for all aspects of their decisions—including specifically confirming that the Defendants could not "be held responsible for the actions of these depositories"—the Plaintiffs cannot legitimately claim to have "reasonably" relied on anything any Defendant allegedly said or did not say about First State Depository or anything else. As one court recently explained:

> Since justifiable reliance is an essential element of any fraud claim, a plaintiff's assent to a non-reliance clause can be fatal to their argument that a prior misrepresentation induced them to enter into the contract containing the non-reliance clause. The logic is simple: a party who knowingly says, "I'm not relying on anything other than A, B, or C as I'm agreeing to this contract," cannot later say, "I relied on X when I agreed to that contract."

*Saleh v. Merchant*, Case No. 14-CV-09186, 2023 U.S. Dist. LEXIS 55653, at *18 (N.D. Ill. Mar. 30, 2023) (granting summary judgment on fraud claims).

Kansas law agrees. *See, e.g.*, *Brock v. Roberts Realty, Inc.*, Op. No. 68,771, 1993 Kan. App. Unpub. LEXIS 204, at *5–8 (Kan. Ct. App. 1993) (affirming summary judgment where the plaintiffs brought a claim for negligent misrepresentation regarding a home's septic system but the sales contract specifically provided that the defendants had made no representations regarding the home's plumbing and other mechanical systems, concluding "the language of the contract controls" because "it is unambiguous, and there is no cause to look beyond the document" (citing *Edwards v. Phillips Petroleum Co.*, 360 P.2d 23 (Kan. 1961), and *Holland Furnace Co. v. Williams*, 295 P.2d 672 (Kan. 1956))).

Because there can be no reasonable reliance as a matter of law, the Plaintiffs' fraud and misrepresentation claims fail. Summary judgment is proper.

## <u>CONCLUSION</u>

While the Plaintiffs' losses are unfortunate, the law governing this situation is well-developed and uniform: the parties' self-directed contracts control and place responsibility on the

accountholder, not passive custodians or administrators. The Plaintiffs affirmed those contracts at trial, and those contracts relieve the Defendants of any potential liability on all claims presented in this case. Nothing in the Plaintiffs' opposition brief or their avalanche of exhibits can change this fundamental, unavoidable point.

Because each of the Plaintiffs' claims fail as a matter of law based on the undisputed facts, the New Direction entities respectfully request that the Court grant this motion and enter summary judgment in the Defendants' favor.

**Dated:** October 10, 2025

Respectfully submitted,

**DENTONS US LLP**

*/s/ Harrison M. Rosenthal*
Stephen R. McAllister (KS # 15845)
Harrison M. Rosenthal (KS # 28894)
4520 Main Street, Suite 1100
Kansas City, Missouri 64111-7700
Telephone:  (816) 460-2400
Facsimile:  (816) 531-7545
stephen.mcallister@dentons.com
harrison.rosenthal@dentons.com

**WOMBLE BOND DICKINSON US LLP**

*/s/ M. Todd Carroll*
M. Todd Carroll* (SC # 74000)
Kevin A. Hall* (SC # 15063)
1221 Main Street, Suite 1600
Columbia, South Carolina 29201
Telephone: (803) 454-6504
todd.carroll@wbd-us.com
kevin.hall@wbd-us.com
*Admitted Pro Hac Vice*

*Attorneys for Defendants*
*New Direction IRA, Inc.*
*New Direction Trust Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 10, 2025, a true and correct copy of the above and foregoing was e-filed with the Court's CM/ECF electronic filing system, which provided notice to all parties who have entered an appearance in this action.

*/s/ Harrison M. Rosenthal*
*Attorney for Defendants*
*New Direction IRA, Inc., and*
*New Direction Trust Company*
